CORRECTED

# In the United States Court of Federal Claims

No. 19-688C

(Filed:  May 6, 2020)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SILVER STATE LAND LLC,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Breach of land sale contract; Federal
Land Policy and Management Act;
Bureau of Land Management;
43 U.S.C. § 1713; 43 C.F.R. Subparts
2710 - 2711; invitation for bids; auction;
land patent; incorporation by reference;
RCFC 12(b)(6); issue preclusion;
collateral estoppel; damages election.

*Seth H. Locke*, Perkins Coie, LLP, Washington, DC, for plaintiff.

*Isaac B. Rosenberg*, United States Department of Justice, Civil Division, Washington, DC,
for defendant.  With him on the briefs were *Joseph H. Hunt*, Assistant Attorney General,
Civil Division, *Robert E. Kirschman, Jr.*, Director, and *Allison Kidd-Miller*, Assistant
Director, Commercial Litigation Branch, Civil Division, United States Department of
Justice, Washington, DC.

## OPINION AND ORDER

**SOLOMSON, Judge.**

As frequently occurs in this Court, we once again are called upon to address an
alleged breach of a government contract "entered into and performed pursuant to a
complex statutory and regulatory scheme[,]" as well as the nature of the relationship
between that scheme and the contract at issue.  *Alder Terrace, Inc. v. United States*, 161
F.3d 1372, 1373 (Fed. Cir. 1998).  The complexity of this matter is compounded by prior
Administrative Procedure Act ("APA") litigation between the Plaintiff, Silver State
Land, LLC ("Silver State"), and the government before the United States District Court

for the District of Columbia, as well as a subsequent appeal from the district court to the United States Court of Appeals for the District of Columbia Circuit.[1]

Before this Court, the central issue is whether the government must pay damages for its alleged breach of a contract to convey a tract of public land to Silver State.  The government, in its motion to dismiss Silver State's first amended complaint ("Complaint") pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), maintains that Silver State's breach claim is precluded as a matter of law.  In the government's view, the Bureau of Land Management ("BLM" or the "Agency")[2] properly declined to transfer the land in question pursuant to statutory provisions that, according to the government, were incorporated into the parties' contract.  The government further argues that Silver State's contract claim is barred under the doctrine of issue preclusion (also known as collateral estoppel) due to the parties' prior APA litigation, which centered on BLM's alleged statutory and regulatory duty to transfer the land at issue.  The government also moves for dismissal on the grounds that Silver State seeks damages of a type that it may not recover as a matter of law, even assuming the government had breached the contract at issue.

The government concedes that it entered into the land sale contract, as Silver State alleges.  Because the Court rejects the government's interpretation of the contract at issue and the application of issue preclusion to plaintiff's claims here, as well as the government's damages argument – among other subsidiary and miscellaneous arguments – the Court **DENIES** the government's motion to dismiss Count I of the Complaint.  Because the Court finds that the parties had an express land sale contract, however, the Court **GRANTS** the government's motion to dismiss Count II of the Complaint, which alleges breach of an implied-in-fact contract.

I.    **Factual Background**[3]

This case involves a land sale contract – formed pursuant to a process prescribed by statute and regulation – that the Agency allegedly breached when it refused to

---

[1] *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 117 (D.D.C. 2015) [hereinafter *Silver State I*] (citing Administrative Procedure Act, 5 U.S.C. § 706(1), (2)), *aff'd*, *Silver State Land, LLC v. Schneider*, 843 F.3d 982 (D.C. Cir. 2016) [hereinafter *Silver State II*].

[2] The BLM is an executive agency within the United States Department of the Interior.  *See* 43 U.S.C. § 1731; Bureau of Land Management, https://www.blm.gov/ (last visited Apr. 28, 2020).

[3] The facts in this Opinion do not constitute factual findings by the Court.  Rather, this Court assumes, as it must, that the factual allegations contained in Silver State's Complaint are true for the purposes of resolving the pending motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678

deliver title to Silver State via a land patent, a document formally transferring public land to a purchaser.[4]

Silver State first filed a lawsuit in the United States District Court for the District of Columbia challenging, pursuant to the APA, the Agency's "decision not to issue the patent for the Property." *Silver State I*, 145 F. Supp. 3d at 125. After the district court denied Silver State's motion for summary judgement and entered judgment for the Agency, Silver State appealed. The United States Court of Appeals for the District of Columbia Circuit affirmed the district court's decision. *Silver State II*, 843 F.3d at 993. Silver State then filed its breach of contract claim in this Court.

The following background section first provides an overview of the statutory and regulatory process that governed the formation of the disputed land sale contract,

---

(2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court also has considered "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). RCFC 9(k) provides: "In pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies. In lieu of a description, the party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions." The Court may rely on an annexed copy of the contract in deciding a motion to dismiss. *See, e.g.*, *Terry v. United States*, 103 Fed. Cl. 645, 647 n.1 (2012) (relying on "an exhibit appended to defendant's motion containing plaintiff's concession contract," which plaintiff referenced in complaint in deciding motion to dismiss).

[4] "A 'patent' is a grant made by the government that confers on an individual fee simple title to public lands." 63C Am. Jur. 2d *Public Lands* § 48 (2020); *see also* Bureau of Land Management, Department of the Interior, *Understanding Land Patents*, General Land Office Records, https://glorecords.blm.gov/reference/default.aspx#id=02_About_Our_Documents|01_Patent s (last visited Apr. 24, 2020) ("Land Patents are Federal Conveyance Documents created on the initial transfer of land titles from the Federal government to individuals."); *Beard v. Federy*, 70 U.S. 478, 491 (1865) (explaining that a land patent "is a deed of the United States" which operates as "a quit-claim, or rather of a conveyance of such interest as the United States possessed in the land"); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 935 F.2d 1263, 1267 (Fed. Cir. 1991) (Newman, C.J., concurring) ("a land patent is a grant of real property from the nation"), *as modified*, 64 F.3d 1553 (Fed. Cir. 1995); *Cavin v. United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992) (noting that a land patent can "convey[] title to the land from the United States to a private party"); *Thompkins-El v. Wells Fargo Bank Minnesota*, 2006 WL 2433438, at *3 (E.D. Mich. Aug. 22, 2006) ("Land patents are essentially deeds that document a transfer in ownership from the Federal Government to individuals that purchase public land.").

then discusses the Complaint's factual allegations relevant to the government's motion dismiss, and finally summarizes Silver State's prior APA litigation.

## A.      Statutory And Regulatory Background

The Federal Land Policy and Management Act of 1976 ("FLPMA") is a complex statute that provides for a nevertheless straightforward process by which BLM may enter into contracts to sell tracts of federally-owned public land.  In particular, the FLPMA and its implementing regulations govern the process for the offer, acceptance, consideration, and authority for land sale contracts executed pursuant to that statute.

### 1.      The Federal Land Policy And Management Act Of 1976

Prior to 1976, "[i]n various enactments, Congress empowered United States citizens to acquire title to, and rights in, vast portions of federally owned land" by purchasing land from the federal government.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 875 (1990).  Congress recognized, however, that the government's "[m]anagement of the public lands under these various laws [was] chaotic."  *Id.* at 876.  As a result, and due to "the need to provide guidance and a comprehensive statement of congressional policies concerning the management of the public lands, Congress enacted the [FLPMA]." *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 737–38 (10th Cir. 1982).

The FLPMA — which BLM today considers its organic statute[5] — "contain[s] many interdependent sections in order to provide the BLM with a versatile framework for its management efforts."  *Id.* at 738.  Section 203 of the FLPMA, codified at 43 U.S.C. § 1713, is the primary statute at issue in this case and governs BLM's sales of tracts of public land.  Pub. L. 94–579, October 21, 1976, 90 Stat. 2743 (codified at 43 U.S.C. § 1713) [hereinafter "Section 1713" or "§ 1713"].

Section 1713 of Title 43 of the United States Code — governing "Sales of public land tracts" — begins by defining the types of tracts of public land BLM may sell.  In particular, the FLPMA provides that BLM may sell tracts of public land "where, as a result of land use planning . . . the Secretary determines that the sale of such tract

---

[5] While the Truman administration created BLM in 1946 by combining the General Land Office and the U.S. Grazing Service, BLM considers the FLPMA its "organic statute" because the FLPMA is the "principal law defining [BLM's] mission."  Bureau of Land Management, Dep't of the Interior, *National History*, History of the BLM, https://www.blm.gov/about/history/timeline (last visited Apr. 10, 2020).  "The Federal Land Policy and Management Act of 1976, as amended, is the Bureau of Land Management's 'organic act' that establishes the agency's multiple-use and sustained yield mandate to serve present and future generations."  Bureau of Land Management, Dep't of the Interior, *The Federal Land Policy and Management Act of 1976*, (2016), https://www.blm.gov/about/laws-and-regulations.

meets" one of three "disposal criteria."[6]  43 U.S.C. § 1713(a).  After imposing certain additional requirements on BLM's sales of "land of agricultural value and desert in character"[7] and "tracts in excess of two thousand five hundred acres,"[8] neither of which considerations is applicable in this case, the FLPMA mandates that BLM cannot sell tracts of public land for "less than their fair market value as determined by the Secretary."  *Id.* § 1713(d).  The FLPMA further directs BLM to "determine . . . tracts of public lands to be sold on the basis of the land use capabilities and development requirements of the land."  *Id.* § 1713(e).

After BLM identifies a tract of public land for a proposed sale, the FLPMA delineates the procedures that BLM must follow to invite and consider offers to purchase that land.  In general, BLM must conduct sales of — and receive offers to purchase — tracts of public land pursuant to "competitive bidding *procedures* to be established by the Secretary."  *Id.* § 1713(f) (emphasis added).  BLM also may employ "modified competitive bidding" procedures — or the Agency may even sell land "without competitive bidding" (called a "direct sale") — when the "Secretary determines it necessary and proper in order (1) to assure equitable distribution among purchasers of lands, or (2) to recognize equitable considerations or public policies, including but not limited to, a preference to users[.]"  *Id.*

In addition to detailing BLM's procedures for seeking and receiving offers to purchase tracts of public land identified for sale, the FLPMA governs the process for BLM's acceptance of an offer.  *Id.* § 1713(g) ("Acceptance or rejection of offers to purchase").  In particular, the FLPMA provides BLM with *only* three, discrete options

---

[6] Specifically, the FLPMA authorizes land sales where the Secretary determines that:

> (1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or

> (2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or

> (3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

43 U.S.C. § 1713(a)(1)–(3).

[7] *Id.* § 1713(b).

[8] *Id.* § 1713(c) (congressional approval procedures applicable to tracts exceeding 2500 acres).

upon receipt of offers from prospective, qualified land purchasers; BLM:   (1) "shall" accept the offer;  (2) "shall" reject the offer;  _or_ (3) "may refuse to accept any offer or may withdraw any land or interest in land from sale under this section [after] determin[ing] that consummation of the sale would not be consistent with this Act or other applicable law."[9]  _Id._  Thus, BLM may decline to accept any particular offer to purchase the land being sold, or it may reverse course and decide not to subject the identified parcel of land to sale at all, but the agency must elect one of those choices "no later than thirty days after the receipt of" a purchase offer.  _Id._[10]

### 2.     BLM's Land Sale Regulations

In addition to governing BLM land sales, the FLPMA vests the Secretary of the Interior with authority to "promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands."  43 U.S.C. § 1740.  Consistent with that provision, the Secretary promulgated regulations to "implement the sale authority of [Section 1713]."  43 C.F.R. § 2710.0-1.  Those regulations are contained in 43 C.F.R. Subparts 2710 and 2711.

Subpart 2710 specifies "General Provisions" that apply to BLM's public land sales.  Those "General Provisions" address, among other topics, the purpose, authority,[11] and policy underlying the regulations.  In that regard, the regulations' objective – consistent with the FLPMA's terms – is to "provide for the orderly

[9] The FLPMA defines "withdrawal" – a term of art – to mean "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than 'property' governed by the Federal Property and Administrative Services Act, as amended from one department, bureau or agency to another department, bureau or agency."  43 U.S.C. § 1702(j).  "To withdraw, then, means to withhold the parcel of land from sale entirely, not to cancel a specific sale to a specific buyer."  _Silver State II_, 843 F.3d at 991.  Consistent with the D.C. Circuit's conclusion in _Silver State II_, neither party contends before this Court that "withdrawal" occurred here.

[10] Alternatively, BLM has until "the end of thirty days after the end of the ninety-day [congressional notification] period" applicable to land tracts in excess of 2500 acres, 43 U.S.C. § 1713(g), but that time period is inapplicable to the alleged sale at issue in this case.

[11] Although the FLPMA and implementing regulations identify the Secretary of the Interior as the government official with authority to sell tracts of public land, _see_ 43 U.S.C. § 1713, 43 C.F.R. § 2710.0-3, the Secretary has "delegated the authority" to certain "authorized officer[s]" within BLM.  43 C.F.R. § 2710.0-5(c).  Those authorized officers possess the authority to contract for land sales on behalf of the United States.  The requirements for a valid contract with the United States include "a Government representative who had actual authority to bind the Government."  _Trauma Serv. Grp. v. United States_, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

disposition at not less than fair market value of public lands identified for sale as part of the land use planning process."  43 C.F.R. § 2710.0-2.

Subpart 2711 provides more detailed "Procedures" implementing the FLPMA and governing the offer, acceptance, consideration, and authority for land sale contracts.  BLM's regulatory "Procedures" are divided into five sections:  (1) Initiation of Sale;  (2) Qualified Conveyees;  (3) Procedures for Sale; (4) Compensation for Authorized Improvements;  and (5) Conveyance Documents.  *See* 43 C.F.R. §§ 2711.1–.5.

Echoing the FLPMA itself, the regulations provide that BLM's sales of tracts of public land begin with the "[i]dentification of tracts by land use planning." 43 C.F.R. § 2711.1-1.  Additionally, the regulations permit the public to make "nominations" – or "requests for sales of [government-owned] public lands" – by submitting such requests "to the District office of the [BLM] for the District in which the public lands are located" and "specifically identify[ing] the tract being nominated or requested and the reason for proposing sale of the specific tract."  *Id.* § 2711.1-1(c).

If BLM decides to sell a tract of land, FLPMA regulations require BLM to issue, publish in the Federal Register, and send to interested parties a Notice of Realty Action ("NORA").  43 C.F.R. § 2711.1-2(a), (d).  The NORA constitutes an "offering for sale [of] a tract or tracts of public lands identified for disposal."[12]  *Id.* § 2711.1-2(a).  A BLM "authorized officer" must publish the NORA "not less than 60 days prior to the sale." *Id.*  Additionally, the regulations require the NORA to "include the terms, covenants, conditions and reservations which are to be included in the conveyance document."  *Id.* Finally, the NORA must include a description of the "method of sale."  *Id.*  The regulations and the resulting NORA thus distinguish between sale procedures, the sale itself, and the conveyance that occurs after, and results from, the sale.

The regulations further limit who may purchase public lands.  In particular, and as relevant here, the regulations provide that BLM may convey a tract of public land to a "corporation subject to the laws of any State or of the United States," among others. 43 C.F.R. § 2711.2 (identifying four categories of qualified purchasers).

Next, the regulations identify and describe the three types of "Procedures for Sale" that BLM may utilize to seek and receive offers to purchase a tract of public land: (1) competitive bidding;  (2) modified bidding;  and (3) direct sales.  *Id.* §§ 2711.3-1–3.

---

[12] While the regulation's use of the word "offering" suggests that a NORA may itself constitute an offer, the NORA – as demonstrated below – cannot be interpreted as anything more than an invitation for bids (or, possibly, as the defendant contends, the advertisement governing an auction).

These categories mirror the ones created by the FLPMA itself. *See* 43 U.S.C. § 1713(f) (addressing "competitive bidding," "modified competitive bidding," and sales "without competitive bidding").

In this case, the parties do not dispute that BLM employed the modified competitive bidding procedures delineated in 43 C.F.R. § 2711.3-2. Accordingly, the Court here focuses on those procedures.

First, 43 C.F.R. § 2711.3-2 provides that BLM "may . . . offer[]" a tract of public land for sale "utilizing modified competitive bidding procedures when the authorized officer determines it is necessary in order to assure equitable distribution of land among purchasers or to recognize equitable considerations or public policies." 43 C.F.R. § 2711.3-2(a). Second, the regulation operationally defines modified bidding to permit BLM to select a "designated bidder" that has "the right to meet the highest bid" the Agency receives pursuant to the NORA's bidding process. *Id.* § 2711.3-2(a)(1)(i). If the "designated bidder[] fail[s] to exercise the preference consideration offered by the authorized officer in the allowed time, the sale shall proceed," with the high bidder as the successful offeror. *Id.* § 2711.3-2(c).

Once BLM decides to utilize modified competitive bidding, the regulations require BLM to publish in the Federal Register a NORA that includes a "description of the method of modified competitive bidding to be used and a statement indicating the purpose or objective of the bidding procedure selected." *Id.* § 2711.3-2(a)(2), (d). As noted above, the NORA thus serves as an invitation for bids ("IFB"), specifying the tract of public land for sale, along with its appraised fair market value. *Id.* § 2711.1-2(a). Prospective purchasers then must submit bids in accordance with the NORA, just like participants in any sealed-bid procurement process must comply with the governing IFB.[13] "Once the method of modified competitive or noncompetitive sale is determined and such determination has been issued, published and sent in accordance with

---

[13] *Cf.* Federal Acquisition Regulation ("FAR") 14.301(a) ("To be considered for award, a bid must comply in all material respects with the invitation for bids."). Although the FAR does not apply to the formation of the contract at issue because it was for a government sale of property and not an acquisition, *see* FAR 1.104, the FAR nevertheless is instructive regarding background federal contracting principles. *See Huntsville Times Co. v. United States,* 98 Fed. Cl. 100, 106 n.6 (2011) (consulting the FAR in a non-FAR procurement "[t]o the extent that basic procurement fairness principles are elucidated" therein); *see also SUFI Network Servs., Inc. v. United States,* 105 Fed. Cl. 184, 195 (2012) ("[T]he FAR is highly relevant as a guide in the absence of other guidance." (internal quotations omitted)).

procedures of this part, payment shall be by the same instruments as authorized in § 2711.3–1(c) of this subpart."  *Id.* § 2711.3-2(d).[14]

The FLPMA's land sale regulations — again, mirroring the statute itself — also govern BLM's acceptance of a purchase offer and provide that BLM's "[a]cceptance or rejection of any offer to purchase shall be in accordance with the procedures set forth in § 2711.3–1 (f) and (g) of this subpart."  43 C.F.R. § 2711.3-2(e).  In turn, 43 C.F.R. § 2711.3-1(f) requires the authorized BLM officer:  (1) to accept an offer; (2) to reject an offer;  <u>*or*</u> (3) to withdraw the tract of public land from sale.  In particular, the regulation provides that BLM must accept or reject an offer "in writing no later than 30 days after receipt of such offer."  *Id.* § 2711.3-1(f).  Additionally, prior to the expiration of the 30 day period, BLM may "refuse to accept any offer or . . . withdraw any tract from sale"[15] after determining that:

> (1) Consummation of the sale would be inconsistent with the provisions of any existing law; or

> (2) Collusive or other activities have hindered or restrained free and open bidding; or

> (3) Consummation of the sale would encourage or promote speculation in public lands.

*Id.; see* Sales—Federal Land Policy and Management Act; Sale of Public Lands, 45 Fed. Reg. 39,416, 39,420 (June 10, 1980) (listing the foregoing criteria as clearly applying not only to a decision to "withdraw any tract from sale," but also to a decision to "refuse to accept any offer").

Of significance for this case, 43 C.F.R. § 2711.3–1(g) conditions the selected, successful offeror's *contract* rights only upon its tendering consideration in the form of the actual payment of the total promised purchase price:

> *Until the acceptance of the offer and payment of the purchase price*, the bidder has no contractual or other rights against the

---

[14] 43 C.F.R. § 2711.3-1(c) provides, in pertinent part, that "[e]ach bid shall be accompanied by certified check, postal money order, bank draft or cashier's check made payable to the [BLM] . . . ."

[15] Although not applicable in this case, the Agency also may take one of these actions prior to the "expiration of 30 days after the end of the [congressional] notice" period.  43 C.F.R. § 2711.3-1(f).

> United States, and no action taken shall create any contractual
> or other obligations of the United States.

43 C.F.R. § 2711.3-1(g) (emphasis added).

The FLPMA and its implementing regulations thus provided the framework for the formation of the contract at issue in this case. With that framework in mind, the Court next turns to the Complaint's factual allegations relevant to the government's motion to dismiss.

### B.      Factual Allegations

The City of Henderson, Nevada ("Henderson") is adjacent to the City of Las Vegas and contains, within its boundaries, certain tracts of public land.[16] In early September 2011, Henderson and Las Vegas National Sports Center LLC ("LVNSC") entered into a master project agreement ("MPA") concerning one of those tracts of public land.[17] Appx. A1-21.[18] The MPA contemplated that Henderson would nominate a tract of public land for sale by BLM to LVNSC, which would "plan, design, develop, construct, complete, and operate" up to four sporting-event venues capable of hosting various professional sports leagues. Appx. A2.

On September 7, 2011, Henderson requested that BLM utilize the direct sale procedures pursuant to 43 C.F.R. § 2711.3-3 to sell an approximately 480-acre tract of public land within Henderson's boundaries (the "Property") to LVNSC. Compl. ¶ 7; Appx. A22. On October 4, 2011, BLM notified Henderson that the Agency could not appropriately utilize the direct sale procedures pursuant 43 C.F.R. § 2711.3-3. Compl. ¶ 10; Appx. A26-27. Instead, BLM suggested that the use of modified competitive

---

[16] *See generally* City of Henderson, Nevada, https://www.cityofhenderson.com/ (last visited Apr. 28, 2020).

[17] *See Silver State I*, 145 F. Supp. 3d at 117 n.3. Silver State's Complaint alleges that Henderson and LVNSC entered into the MPA on October 18, 2011. Compl. ¶ 9. *Silver State I* and the appendix to the government's motion to dismiss indicate, however, that Henderson and LVNSC entered into an initial MPA in early September 2011, but then subsequently "amended and restated" the MPA on October 18, 2011. In any event, the date on which Henderson and LVNSC entered into the MPA is immaterial to this decision.

[18] The government attached an appendix to its motion to dismiss, containing certain documents, many of which Silver State's complaint incorporates by reference. This Court may consider "matters incorporated by reference or integral to the claim" in ruling on a motion to dismiss pursuant to RCFC 12(b)(6). *Dimare Fresh, Inc.*, 808 F.3d at 1306 (internal quotation omitted). The Court cites to those documents using the abbreviation "Appx. A__," with the relevant page number inserted.

bidding procedures pursuant to 43 C.F.R. § 2711.3-2; BLM sought Henderson's concurrence in that approach.  Compl. ¶ 10; Appx. A26-27.  On October 10, 2011, Henderson notified BLM that Henderson concurred with the Agency's plan to offer the Property via the modified competitive bidding procedures at 43 C.F.R. § 2711.3-2 and to identify LVNSC as the designated bidder with the right to match the highest offer. Appx. A28.

On October 18, 2011, Henderson and LVNSC entered into an amended and restated MPA.  Appx. A31.  In early 2012, BLM agreed to substitute Silver State, an affiliate of LVNSC, as the designated bidder in the planned sale of the Property. Compl. ¶ 11.

On April 4, 2012, BLM published a NORA in the Federal Register for the "Modified Competitive, Sealed-Bid Sale" of the Property.  Compl. ¶ 12; Notice of Realty Action: Modified Competitive, Sealed-Bid Sale of Public Land in Clark County, NV, 77 Fed. Reg. 20,413 (Apr. 4, 2012) (Appx. A73).  The NORA began with a "Summary" section, which provided that BLM "proposes to offer [the Property] by modified competitive, sealed-bid sale . . . at not less than the appraised fair market value (FMV) of $10,560,000."  77 Fed. Reg. at 20,413 (Appx. A73).  The "Summary" section further provided that "[t]he sale will be subject to the applicable provisions of Section[] 203 of the [FLPMA] . . . and BLM land sale regulations at 43 CFR 2710."  *Id.*  Section 203 of the FLPMA is codified at 43 U.S.C. § 1713.  The NORA then included a "Dates" section, which specified that BLM must receive all sealed-bid offers to purchase the Property by June 4, 2012, the date upon which BLM indicated it would open the sealed bids.  *Id.*

After several short sections regarding how to contact the Agency with questions or comments, the NORA contained a "Supplementary Information" section.  *Id.*  The "Supplementary Information" section described the Property, *id.* at 20,413-14 (Appx. A73-74), and provided that "[t]he use of the modified competitive, sealed-bid sale method is consistent with the regulations at 43 CFR 2711.3-2(a)."  *Id.* at 20,414 (Appx. A74).  The section further notified potential offerors that Silver State was the "designated bidder."  *Id.*

Following the "Supplementary Information" section, the NORA included a "Sale procedures" section.  77 Fed. Reg. at 20,414 (Appx. A74).  That section of the NORA informed all offerors that any bid must include a "bid guarantee deposit" and a check for twenty percent of the total bid amount.  *Id.*  Because Silver State was the designated bidder, the NORA's "Sale procedures" section required Silver State's authorized representative to "be present at the bid opening."  *Id.*  The "Sale procedures" section then provided that "[a]cceptance or rejection of any offer to purchase will be in

accordance with the regulations at 43 CFR 2711.3-1(f) and (g)." *Id.* Finally, the "Sale procedures" section provided:

> Within 30 days of the sale, the BLM will, in writing, either accept or reject all bids received. No contractual or other rights against the United States may accrue until the BLM authorized officer officially accepts the high bid offer to purchase and the full bid price is paid.

*Id.* This provision in the NORA reflects the requirements of the FLPMA and its implementing regulations, as described above.

Finally, the NORA included a specific "*Terms and Conditions*" section. 77 Fed. Reg. at 20,415 (Appx. A75) (italics in original). That section provided terms and conditions for a contract resulting from the "Sale procedures," in addition to certain "numbered terms, conditions, and reservations [that would] appear on the conveyance document." *Id.*[19] Thus, the NORA's "*Terms and Conditions*" section contained contractual terms, including the repeated condition that "[n]o contractual or other rights against the United States may accrue until the BLM officially accepts the offer to purchase, and the full bid price is submitted by the 180th day following the sale." *Id.* The section further provided:

> In accordance with 43 CFR 2711.3-1(f), the BLM may accept or reject any or all offers to purchase, or withdraw any parcel of land or interest therein from sale, if, in the opinion of a BLM authorized officer, *consummation of the sale* would be inconsistent with any law, or for other reasons as may be provided by applicable law or regulations.

*Id.* at 20,416 (Appx. A76) (emphasis added). As this Court explains below, and pursuant to the plain language of 43 C.F.R. § 2711.3-1(f) and the NORA,[20] BLM was required to make any such decision "no later than 30 days after receipt of" offers. This "*Terms and Conditions*" section did *not* include any requirement that Silver State adhere to the MPA, nor would it have made sense to include such a requirement because the

---

[19] As explained above, the conveyance document is known as a land patent and is the document the United States uses to convey title of public land to purchasers. *See* 43 C.F.R. § 2711.5 (noting that a patent is a conveyance document).

[20] Appx. A74 ("Within 30 days of the sale, the BLM will, in writing, either accept or reject all bids received.").

NORA also permitted – and would have governed – potential competing offers, while the MPA was solely between Silver State's affiliate and Henderson.

On June 4, 2012, Silver State submitted a bid – consistent with the NORA's terms – in the amount of $10,560,000, matching the NORA's appraised fair market value of the Property. Compl. ¶ 14; Appx. A84. Per the NORA's requirement, Silver State included certified checks totaling $2,132,000 with its bid and otherwise met all the NORA's requirements. Compl. ¶ 14; Appx. A92. Because BLM did not receive any other offers to purchase the Property, Silver State had no need to exercise its preference right as the "designated bidder" to match another prospective purchaser's high bid.

On June 12, 2012, BLM issued a written acceptance of Silver State's offer. Compl. ¶ 15; Appx. A94-95. BLM's "Acceptance of Bid" letter ("Acceptance Letter") to Silver State instructed that Silver State had "180 days *from the sale date . . .* to pay the [remaining] balance of $8,428,000," *i.e.*, the bid price after deducting the down payment that Silver State had included with its bid. Appx. A95 (emphasis added). BLM's Acceptance Letter further warned Silver State that "[f]ailure to submit the balance by December 3, 2012, [would] result in cancellation of the sale." *Id.* The Acceptance Letter required Silver State to provide evidence that it was a U.S. corporation "authorized to hold property or an entity legally capable of conveying lands or interests there in [sic] under the laws of the State of Nevada," and cautioned that failure to submit such evidence "within 30 days *from the sale date of June 4, 2012*, shall result in the cancellation of the sale." *Id.* (emphasis added). The Agency specified no other potential grounds of cancellation in the Acceptance Letter.

On or about August 16, 2012, BLM issued to Silver State escrow instructions, which both parties executed. Compl. ¶ 16; Appx. A96-97. The instructions were "for use in processing a land patent through escrow to Silver State Land LLC pursuant to Section 203 [of the FLPMA]" and "pursuant to Section 4(a) of the Southern Nevada Public Land Management Act of 1998, P.L. 105-263, 111 Stat. 2343, *et seq.*," by BLM "on behalf of the United States of America." Appx. A96. The escrow instructions to which the parties agreed provided that "[t]he transaction is found to be in the public interest and otherwise in conformance with the laws and regulations." *Id.* The instructions further provided that "failure to pay the full price on or before the [sic] December 3, 2012, to either BLM or the escrow company, disqualifies the bid and the bidder will forfeit their [sic] entire bid deposit to BLM." *Id.* Upon such timely payment (or, more precisely, "[e]vidence of payment"), "BLM **will** then provide the patent and *Acknowledgment of Delivery* to Nevada Title [— the escrow agent —] within 30 days." *Id.* (bold added, italicized text in original). No other conditions for delivery of the patent were specified, and the escrow instructions further caveated that "[c]hanges may be made by mutual agreement of the parties" and "must be in writing and signed by the

[sic] all parties named below." *Id.* The document was executed by a BLM official and a representative of the "Patentees(s)" – a reference to Silver State. *Id.* at A97.

Subsequent bilateral, written amendments to the initial, executed escrow instructions extended BLM's contractual deadline for patent delivery, but no such amendment ever deleted either (1) BLM's commitment that it "*will . . . provide the patent[,]*" or (2) the parties' agreement that the "transaction is found to be in the public interest and otherwise in conformance with the laws and regulations." Appx. A96 (emphasis added).

Several days before the payment due date, on November 28, 2012, Silver State tendered $8,428,000 — the balance of the purchase price — into escrow. Compl. ¶ 17; Appx. A98-101. The escrow officer notified BLM that Silver State had tendered the balance into escrow at approximately 3:44 p.m. that day. Appx. A100. After Silver State had tendered the balance of the purchase price into escrow, LVNSC terminated its MPA with Henderson.[21] Compl. ¶ 19.

On November 29, 2012, Henderson notified BLM that LVNSC had terminated the MPA; Henderson requested that BLM postpone conveying the land patent for the Property to Silver State. Compl. ¶ 20; Appx. A102-04. On December 20, 2012, Silver State and BLM agreed to extend the date by which the Agency had to convey the land patent to Silver State, amending the escrow agreement in writing. Compl. ¶ 21; Appx. A106-07. The amended escrow instructions provided that the purpose of the extension was to "facilitate settlement discussions between [LVNSC] and the City of Henderson regarding the uses of the land following patenting of the land by the United States." Appx. A106 ("Modifications for Escrow Instructions for N-90450").

On January 28, 2013, Henderson filed suit against LVNSC, Silver State, and other associated entities and individuals in Nevada state court, alleging various breach of contract and fraud claims arising from LVNSC's termination of the MPA. Compl. ¶ 22. On February 5, 2013, Silver State and BLM agreed to a second extension of time for the Agency to convey the land, via a patent, to Silver State. Compl. ¶ 23; Appx. A162-64.

On March 7, 2013, the Nevada state court dismissed all of Henderson's non-contract claims, and, on March 14, 2013, Silver State and Henderson executed a settlement agreement, resolving the remaining contract claims. Compl. ¶ 24. At that

---

[21] As noted above, Henderson requested that BLM substitute Silver State, an affiliate of LVNSC, as the designated bidder. Appx. A66. In early 2012, BLM agreed to substitute Silver State as the designated bidder in the forthcoming sale of the Property. Compl. ¶ 11.

point, Silver State and BLM once again agreed to extend the time for BLM to convey the land patent to Silver State, this time until May 13, 2013.  Compl. ¶ 28; Appx. A183.

None of the escrow modifications extending the time for the Agency to deliver the land patent for the subject Property – there were three extensions in total – ever deleted or otherwise altered the parties' finding in the original escrow instructions that "[t]he transaction is . . . in the public interest and otherwise in conformance with the laws and regulations."  Appx. A96; *see also, e.g.,* Appx. A183 (March 14, 2013 Modifications for Escrow Instructions for N-90450) (agreement that "[a]ll other instructions remain the same from the original August 2012 escrow instructions, as amended on December 20, 2012 and February 5, 2013").  Nor, as noted above, did Silver State ever agree to excuse BLM's commitment that it "*will . . . provide the patent*" to Silver State.  Appx. A96 (emphasis added).  On April 5, 2013, Henderson informed BLM that Henderson no longer opposed BLM conveying the subject Property to Silver State.  Compl. ¶ 27; Appx. A187-88.  On May 9, 2013, BLM sent Silver State a draft land patent to review.  Compl. ¶ 29.

On May 10, 2013, however, two BLM officials – the Acting Deputy Director for Operations and BLM's Nevada State Director – sent a memorandum to the Acting Assistant Secretary for Land and Minerals Management (the "Assistant Secretary"), entitled "Termination of Patent Issuance to Silver State Land, LLC, for Land Nominated for Sale by the City of Henderson, Nevada for Arena Development Project."  Appx. A189.  As indicated in the title of that document, the BLM officials focused – as did the parties' subsequent APA litigation – on the Agency's asserted power *not* to transfer the land patent.  Thus, in the memorandum, the BLM officials recommended that the Assistant Secretary "take jurisdiction over this matter, pursuant to the authority reflected in 43 C.F.R. § 4.5(a), and render a final decision on *whether a land patent should be issued* to Silver State."  Appx. A192 (emphasis added).  The BLM officials further recommended that the Assistant Secretary direct BLM to "(i) not issue the patent to Silver State, (ii) terminate the sale process, and (iii) take the steps necessary to return the purchase deposit and bid guarantee to Silver State."  Appx. A192-93.  This recommendation was premised, at least in-part, on the Secretary of the Interior's "broad authority over the disposition of the public lands up to the point of patent issuance, including the authority to make an independent evaluation as to *whether the patent should issue.*"[22]

---

[22] Appx. A193 (emphasis added) (citing 209 DM 7; 98 I.D. 248, 250 (1991) [a Department of Interior Manual]; *Cameron v. United States*, 252 U.S. 450, 459-64 (1920); *Knight v. United States Land Association*, 142 U.S. 161, 177 (1891); *United States v. Villamson*, 75 I.D. 338, 342 (1968); *United States v. United States Borax Co.*, 58 I.D. 426, 430 (1943); *Ideal Basic Industries, Inc. v. Morton*,

On May 10, 2013, the Assistant Secretary issued a decision memorandum, entitled "Termination of Patent Issuance to Silver State Land LLC, for Land Nominated for Sale by the City of Henderson, Nevada for Arena Development Project." Compl. ¶ 30.  The Assistant Secretary took "jurisdiction over this matter, pursuant to the authority reflected in 43 C.F.R. § 4.5(a)" and issued a written decision, directing BLM to:

> (i) not issue the patent to Silver State, LLC, (ii) terminate the sale process, and (iii) take the steps necessary to return the purchase deposit and bid guarantee to Silver State, LLC, ($2,132,000) as expeditiously as practicable.

Compl. ¶ 31; Appx. A195.[23]  No documents currently before the Court show that, before issuing this written decision: (1) the Agency advised Silver State in writing in advance of such action, (2) the Assistant Secretary requested the administrative record, or (3) the Agency otherwise provided Silver State with an opportunity to respond to BLM's recommendation memorandum.

On May 13, 2013 — more than five months after Silver State terminated its MPA with Henderson, but just four days after BLM transmitted a draft land patent to Silver State for review — BLM declined to convey the land patent to Silver State, allegedly contrary to the terms of the NORA, BLM's acceptance of Silver State's bid, and the agreed-upon escrow instructions.  Compl. ¶ 33.

## C.   Procedural History

On May 15, 2013, Silver State filed a complaint in the United States District Court for the District of Columbia, "claiming that 'the decision to withdraw the sale was contrary to statutory limitations regarding the ability to withdraw the sale, and was arbitrary and capricious,' in violation of the Administrative Procedure Act." *Silver State I*, 145 F. Supp. 3d at 117.  Silver State moved for summary judgment "to set

---

542 F.2d 1364, 1367-68 (9th Cir. 1976); *West v. Standard Oil Co.*, 278 U.S. 200 (1927); *Gabbs Exploration Co. v. Udall*, 315 F.2d 37, 40-41 (D.C. Cir.), cert. denied, 375 U.S. 822 (1963); *United States v. State of California* (On Rehearing), 55 I.D. 532, 542-46 (1936)).  None of those cited decisions concerned a claim under the Tucker Act for the government's breach of contract.  *See* Tr. at 80:13-20 (government conceding cited cases did not involve contracts for sale of property).

[23] The government characterizes the Assistant Secretary's decision as an order to BLM to not perform its contractual duty rather than an order terminating the contract.  *See* Tr. at 95:13-14 ("There was no termination of the contract.  There was an order not to perform.").  The Court considers this characterization to be, at best, a distinction without a difference; taken literally, however, the government appears to concede breach.

aside the [BLM] determination and order immediate delivery of the land patent to [Silver State]." *Id.* Silver State challenged the:

> decision ***not to issue the patent*** for the Property to [Silver State] and to terminate the sale process on three principle grounds: (1) the agency lacked authority to terminate the sale; (2) the agency's decision was arbitrary and capricious; and (3) the agency violated the plaintiff's due process rights by terminating the sale without providing the plaintiff an opportunity or reason to submit additional information.

*Id.* at 125 (internal citations and quotations omitted) (emphasis added).[24]  The district court "conclude[d] that the agency interpreted applicable statutory provisions and its own regulations reasonably to provide authority to terminate the sale and, consequently, the challenged decision was not arbitrary and capricious but supported by substantial evidence, and that the plaintiff's due process rights were not violated." *Id.*  The district court further held – and this is particularly relevant here – that the Secretary has "plenary power . . . to determine *the lawfulness of the issuance of a patent*" and that the FLPMA does not constrain that power.  *Id.* at 128 (emphasis added).  Consequently, the district court denied Silver State's motion for summary judgment.  *Id.*

Silver State appealed that decision to the United States Court of Appeals for the District of Columbia Circuit.  *Silver State II*, 843 F.3d at 985.  The D.C. Circuit reviewed the Agency action *de novo* to determine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* at 989 (quoting 5 U.S.C. § 706(2)(A)).  The D.C. Circuit affirmed the district court's judgment, holding "that the Secretary had plenary power to terminate the land sale, and that the [FLPMA] did not constrain the Secretary's power" to refuse to provide the land patent.  *Id.* at 985.  The D.C. Circuit concluded, in particular, that 43 U.S.C. § 2 "includes the authority to terminate a land sale using a modified competitive auction where the basis for the modified auction dissipates."  *Id.* at 989.[25]  The D.C. Circuit further held that the FLPMA "does not limit the Secretary's plenary power [under 43 U.S.C. § 2]."  *Id.* at 992.

---

[24] The district court does not appear to have addressed the latter ground in terms of the Agency's compliance (or lack thereof) with 43 C.F.R. § 4.5(c).  *See, infra,* Section III.B.5.

[25] 43 U.S.C. § 2 provides:

> The Secretary of the Interior or such officer as he may designate shall perform all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private

Neither the district court nor the D.C. Circuit ruled on the contract issues central to this case.[26]  Instead, the D.C. Circuit agreed that "the District Court correctly noted" as follows:

> This regulation [43 C.F.R. § 2711.3-1(g)] merely delineates when an offeror has *no* contractual rights, and not when contractual rights *do* attach.  Furthermore, to the extent this regulation may confer any contractual right upon an offeror whose offer has been accepted, the regulation is silent as to what those rights may be.

*Silver State II*, 843 F.3d at 992 (quoting *Silver State I*, 145 F. Supp. 3d at 131 n.14) (italics in original).

On May 9, 2019, Silver State filed its original complaint in this Court.  On October 24, 2019, Silver State filed its amended Complaint.  On November 7, 2019, the government filed a motion to dismiss Silver State's Complaint pursuant to RCFC 12(b)(6).  The parties fully briefed the motion, the Court held oral argument on February 26, 2020, and the parties filed post-argument supplemental briefs on March 11, 2020.

## II.     Standard Of Review

The government moves to dismiss Silver State's Complaint pursuant to RCFC 12(b)(6).  When considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6), the Court accepts as true all *factual* allegations — but not legal conclusions — contained in a plaintiff's complaint.  *See Twombly*, 550 U.S. at 555.  For a plaintiff's complaint to survive a motion to dismiss, the Court — viewing the facts in the light most favorable to the plaintiff — must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations and internal quotation marks omitted); *Chapman Law Firm Co. v. Greenleaf*

---

claims of land, and the issuing of patents for all grants of land under the authority of the Government.

[26] *See, infra*, Section IV; *see also* Def. Reply at 10 ("Silver State shuns any preclusive effects of its prior APA suit here because 'no contractual rights or liabilities' were decided by the district court and D.C. Circuit…We have never contended otherwise." (internal citations omitted)).

*Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (noting that the Court's duty is not to determine "whether the claimant will ultimately prevail" when ruling on a 12(b)(6) motion to dismiss). A plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).

## III.   Silver State's Amended Complaint States A Claim For Breach Of Contract[27]

The Tucker Act, 28 U.S.C. § 1491, establishes this Court's jurisdiction and provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a).

In addition to conferring jurisdiction on the Court, the Tucker Act waives the sovereign immunity of the United States "[f]or actions pursuant to contracts with the United States[.]" *Roth v. United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004); *see United States v. Mitchell*, 463 U.S. 206, 212-16 (1983). "To recover for breach of contract, a party must allege and [ultimately] establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Silver State's Complaint adequately alleges each of these elements. Indeed, the documents that the government attached to its motion to dismiss all but prove the Agency's breach, although the Court does not definitively so decide that issue, at this stage of the case.[28]

---

[27] For the purposes of this section of the Court's decision, the Court entirely puts to one side the government's issue preclusion and other defenses as grounds for dismissal, which are addressed in subsequent sections of this decision.

[28] "Pursuant to RCFC 12(c), the trial court may convert a motion to dismiss into a motion for summary judgment under RCFC 56 if it relies on evidence outside the pleadings." *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1355 (Fed. Cir. 2002). "Whether to accept extra-pleading matter on a motion for judgment on the pleadings and to treat the motion as one for summary judgment is within the trial court's discretion." *Easter v. United States*, 575 F.3d 1332,

### A.     Silver State's Complaint Alleges The Parties Had An Express Contract That The Government Breached

To recover for breach of contract, a plaintiff must allege (and ultimately establish) that the parties had a valid contract.  The requirements for a valid contract with the United States are: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."  *Trauma Serv. Grp.*, 104 F.3d at 1326.  Silver State's Complaint adequately alleges the existence of a valid, express contract between Silver State and BLM.

According to the Complaint, Silver State and BLM had a mutual intent to contract for the conveyance of the Property and the Agency representative who entered the agreement had authority to bind the United States in contract.  Compl. ¶¶ 1, 14, 15, 17; Appx. A73-76, A84-101, A106-08, A162-64, 183-85.  Specifically, on April 4, 2012, BLM issued the NORA,[29] which invited both Silver State – as the designated bidder – and the (qualified) public at large, to submit offers to BLM to purchase the Property on certain terms and conditions.  Compl. ¶ 12-13; Appx. A73-76.

Similar to an IFB in a procurement conducted pursuant to the FAR, the NORA at issue here specifically invited prospective purchasers of the identified Property to submit bids pursuant to the NORA's terms governing the sale mechanics.  This included procedural requirements for the submission and acceptance of offers,[30]  bidder qualifications,[31] and the actual terms and conditions of the resulting land sale contract itself (including provisions that ultimately would be inserted into a final conveyance document, known as a land patent).[32]

With regard to the sale process, the NORA required that "[s]ealed bids may be mailed or delivered to the BLM Las Vegas Field Office, at the address below, beginning May 21, 2012[,]" but "must be received by the BLM Las Vegas Field Office no later than 4:30 p.m. Pacific Time, June 4, 2012 in accordance with the sale procedures."

---

1335 (Fed. Cir. 2009) (discussing RCFC 12(b)(6)).  Silver State does not challenge the Court's consideration of the documents the government filed along with its motion to dismiss, and neither party suggests the dismissal motion should be treated as one for summary judgment.

[29] The government does not dispute either (1) that the NORA was lawful when issued, or (2) that the NORA was issued by an agency official with authority to do so.

[30] Appx. A74 (explaining how offerors must submit bids and how BLM will accept or reject bids in the "Sale procedures" section).

[31] Appx. A74 (specifying "qualified bidder[]" requirements pursuant to "Federal law").

[32] Appx. A75 ("Terms and Conditions") ("The following numbered terms, conditions, and reservations will appear on the conveyance document for this parcel.").

Appx. A73.  The NORA also contained a section entitled "Sale procedures[,]" which included detailed instructions for "sealed-bid" submissions, and further provided that "sealed bids will be opened and recorded to determine the high bidder on June 4, 2012. The high bid among the qualified bids received will be declared."  *Id.* at A74.

The NORA identified Silver State as the "designated bidder," *id.*, essentially giving Silver State the right of first refusal by providing that Silver State would "have the opportunity at the bid opening to meet and accept the high bid as the purchase price."  *Id.*  Only if Silver State declined the opportunity to match the "declared high bid" would some other potential purchaser "be declared the successful bidder."  *Id.*

On June 4, 2012, and allegedly in compliance with the NORA's terms, Silver State submitted a valid offer to purchase the Property for the appraised fair market value of $10,560,000, tendering $2,132,000 along with its offer, the latter sum representing the required bid deposit and guarantee.  Compl. ¶ 14; Appx. A84-92.

Whether the NORA is viewed as essentially an IFB (similar to those in the procurement context, as per the FAR) or as effectuating an auction,[33] the result is the same:  the NORA invited bids in compliance with the NORA's instructions, but BLM had to accept a bid to form a contract.  *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 320 (Fed. Cir. 1997) ("In sealed bid procurements the government solicits bids by issuing an [IFB].  The IFB is not an offer by the government to purchase goods or services: the prospective contractor's bid is the offer, and the government's award of the contract is the acceptance.  J. Cibinic & R. Nash, *Formation of Government Contracts* 153 (2d ed. 1986).  In sealed bid procurements, acceptance by the government is made without negotiation or material variation from the terms of the contractor's offer.").

Ordinarily, "case law makes clear that an invitation for bids issued by the government constitutes a solicitation for an offer; the bid invitation is not an offer itself from which plaintiff can create a binding agreement by accepting[.]"  *Essen Mall Properties v. United States*, 21 Cl. Ct. 430, 439–40 (1990).  In this case, the Court holds that there is no practical distinction between viewing the transaction at issue as having arisen from an IFB or, as the government contends, an auction.  Viewed under either construct, offerors had to submit bids in compliance with the NORA's instructions, the terms of the NORA were binding upon both parties, and compliant bids by definition offered the "Terms and Conditions" specified in the NORA.  *Erie Coal & Coke Corp. v. United States*, 266 U.S. 518, 520 (1925) ("The terms and conditions of the sale as set forth

---

[33] The government characterizes the land sale process described in the NORA as a "restricted auction."  Def. Reply at 1.

in the advertisement were binding alike upon the United States and the bidders.").[34]  In that regard, the NORA quite clearly restricted the Agency's options upon the receipt of bid submissions, informing prospective bidders that "[a]cceptance or rejection of any offer to purchase *will be* in accordance with the regulations at 43 CFR 2711.3-1(f) and (g)."  Appx. A74 (emphasis added).  Moreover, the NORA required that, "[w]ithin 30 days *of the sale*, the BLM *will*, in writing, *either accept or reject* all bids received."  *Id.* (emphasis added).[35]

On June 12, 2012, and consistent with the NORA, an authorized officer of BLM issued an unequivocal and unambiguous[36] written acceptance of Silver State's offer[37] to

---

[34] *See also United States v. Purcell Envelope Co.*, 249 U.S. 313, 318 (1919) ("The procedure for the advertising for bids" gives the government "the benefit of the competition of the market and each bidder is given the chance for a bargain.  It is a provision, therefore, in the interest of both government and bidder, necessarily giving rights to both and placing obligations on both."); *Particular types of offers – Requests for bids*, 1 Williston on Contracts § 4:13 (4th ed.) ("Often tenders or bids are advertised for by public corporations, municipalities, counties or states, or private corporations.  The rules governing such bidding are analogous to the rules governing auction sales.  Thus, an ordinary advertisement for bids or tenders is not itself an offer, but the bid or tender is an offer which creates no right until accepted."); Restatement (Second) of Contracts § 28 (1981) ("Unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, posting or other publication of which bidders are or should be aware. . . ."); *YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 398 (1993) ("Had the instant selection process been conducted as a sealed bid, which it was not, failure to comply in all material respects with the invitation for bids would have been fatal to the bidder's chances for award."); *Commodities Recovery Corp. v. United States*, 34 Fed. Cl. 282, 289 (1995) ("Auction sales are viewed under the same rules pertaining to the formation of contracts generally.  *See,* 1 Samuel Williston, *Williston on Contracts* § 29, (3rd ed. 1957).  In auctions, the potential purchaser's bid is the equivalent of an offer to buy the merchandise.  This offer is accepted by the auctioneer upon the fall of the hammer.").  In this case, of course, there was no auctioneer's "hammer," but rather BLM issued a formal Acceptance Letter to Silver State.  *But see Frankel v. United States,* 842 F.3d 1246, 1250 (Fed. Cir. 2016) ("the majority of courts have long interpreted announcement of a contest as a contractual offer by a sponsor and entry into the contest by a contestant as acceptance of that offer").

[35] *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 912 (Fed. Cir. 1988) ("Nor do we believe that the express reservation contained in the advertisement in which the Forest Service reserved the right to reject all bids allows the Service the discretion to be arbitrary or capricious in rejecting all bids.").

[36] The Acceptance Letter is subtitled "Acceptance of Bid," and characterized the government as having "offered" a "parcel of public land" – clearly via the NORA – to Silver State in "a modified competitive sealed bid sale" process.  Appx. A94.

[37] Again, although not applicable to the land sale at issue, the FAR nevertheless supplies an instructive definition of the term "offer."  "Offer means a response to a solicitation that, if

purchase the Property, conditioned only upon Silver State's fulfilling its promise to pay into escrow $8,428,000 – the remaining balance of the purchase price – prior to December 3, 2012.  Compl. ¶ 15; Appx. A94-95.   The Acceptance Letter indicated that Silver State "must now submit the remaining balance in the amount of $8,428,000.00, by December 3, 2012."  Appx. A94.[38]  Finally, the Acceptance Letter provided that "[f]ailure to submit the balance by December 3, 2012, shall result in cancellation of the sale and forfeiture of [Silver State's] 20 percent deposit."  *Id.*

The government does not assert that BLM's acceptance of Silver State's offer was somehow unauthorized or otherwise improper or contrary to law *at the time of acceptance*; nor does the government deny that the parties formed a contract once Silver State paid the full purchase price for the Property.  Transcript of Oral Argument ("Tr.") at 13:10-15 ("THE COURT: Does the government agree that upon payment – the final payment of the full purchase price, that at that point in time, there was a contract by Silver State with the United States for the purchase of the land in question?  MR. ROSENBERG: Yes."); *id.* at 40:1-3 ("MR. ROSENBERG: [The contract] was not void [ab initio].  It was only the intervening change of the events that rendered it to be out of compliance with the law.").

Ordinarily, BLM's mere written acceptance of Silver State's offer to purchase the subject Property would have resulted in an enforceable contract.[39]  In this case,

---

accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids[.]'" FAR 2.101.

[38] The Acceptance Letter also reiterated the qualified bidder requirements first specified in the NORA, and instructed Silver State to submit certain documentation demonstrating its qualification to purchase the Property "within 30 days *from the sale date of June 4, 2012*," and that failure to submit to submit such documentation "shall result in the cancellation of *the sale.*" Appx. A95 (emphasis added).  The Acceptance Letter itself thus demonstrates that BLM viewed its written acceptance of Silver State's offer to constitute "the sale."  Silver State already had submitted the required documentation with its bid.  Appx. A85-92.

[39] *A-Transp. Northwest Co. v. United States*, 36 F.3d 1576, 1581 (Fed. Cir. 1994) ("[T]he Government was empowered to create a contract by accepting A–Transport's offer.  This it did in November 1986, when it notified those carriers whose tenders had been accepted."); Restatement (Second) of Contracts § 50 (1981) ("The typical contract consists of mutual promises and is formed by an acceptance constituting a return promise by the offeree.  A promissory acceptance may be explicitly required by the offer, or may be the only type of acceptance which is reasonable under the circumstances…."); *McMaster Const., Inc. v. United States*, 23 Cl. Ct. 679, 684 (1991) ("sealed bid procurements result in contracts upon acceptance or award by the [contracting officer]"), *declined to follow on other grounds by Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1133 (Fed. Cir. 1998).  Although the Acceptance Letter appears to have been completely consistent with the NORA, even if the acceptance were treated as a BLM counteroffer to Silver State, the latter accepted the terms of the Acceptance Letter when Silver

however, the NORA's terms made clear that "[n]o contractual or other rights against the United States may accrue until [1] the BLM authorized officer officially accepts the high bid offer to purchase and [2] the full bid price is paid."  Appx. A74; *see also id.* at A75 ("No contractual or other rights against the United States may accrue until the BLM officially accepts the offer to purchase, and the full bid price is submitted by the 180th day following the sale.").[40]

On November 28, 2012, in compliance with the NORA, the terms of the Acceptance Letter, and the escrow agreement that the parties executed on or about August 17, 2012, *see* Appx. A96-97, Silver State tendered $8,428,000 into escrow, thereby paying for the Property on time and in full.  Compl. ¶ 17; *see also* Appx. A98-101 (evidence of timely payment).

Accordingly, as of November 28, 2012, when Silver State transmitted its final, total payment for the Property, Silver State and BLM unequivocally formed a valid, express, written contract[41] that consisted of:  (1) the NORA (or at least certain provisions

---

State tendered the balance due by the specified date.  *See First Commerce Corp. v. United States*, 335 F.3d 1373, 1381 (Fed. Cir. 2003) ("'A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.'"  (quoting Restatement (Second) of Contracts § 59 (1979)).

[40] The Court holds, accordingly, that, absent this language in the NORA, Silver State's contract rights would have arisen upon the government's acceptance of Silver State's bid.  As explained in more detail below, the effect of the NORA and the payment terms contained in BLM's Acceptance Letter served to delay Silver State's contract rights, at most, only until Silver State tendered the full bid price to the Agency.

[41] *Pollock v. United States*, 91 Ct. Cl. 257, 259 (1940) ("The contract between the parties is comprised in an invitation for sealed bids for the purchase of certain condemned material belonging to the United States Navy . . ., described in said invitation, and upon the terms and conditions set out at length therein, and in plaintiffs' written offer in response to certain invitations for bids, and in the acceptance of such offer on behalf of the defendant by the supply officer at the U. S. Naval Fuel Depot."); *see Levinson v. United States*, 258 U.S. 198, 199-200 (1922) (bid was offer and acceptance of second highest bid formed binding contract in spite of offeree's later attempt to rescind after discovering misplaced highest bid); *Contracts-Auctions-Bid Received at Public Sale Operates As Offer*, 31 Yale L.J. 887, 888 (1922) (discussing *Levinson* and explaining that "[a]n advertisement that the property will be sold at a public sale to the highest bidder is no more than an invitation to submit bids or offers. . . .  Hence a bid may be withdrawn at any time before its acceptance, but when it is accepted a valid contract is created. . . . [,]" but noting that "[a]n advertisement may be sufficiently explicit to constitute an offer"); *United States v. Sabin Metal Corp.*, 151 F. Supp. 683, 687 (S.D.N.Y. 1957) (citing *Levinson* for the proposition that "[t]he defendant's bid constituted the offer and the government's acceptance completed the contract" and holding that "[t]he fact that the government reserved the right to reject any or all offers did

within the NORA), Appx. A73-76; (2) Silver State's offer submitted in compliance with the NORA, Appx. A84-92; (3) BLM's Acceptance Letter, Appx. A94-95; and (4) the August 17, 2012 bilateral escrow instructions agreement and various written amendments to those instructions, Appx. A96-97, A106-08, A162-64, A183-85.[42]

Critically, neither party disputes that, as of November 28, 2012, the parties had a valid land sale contract, with the only remaining contractual duty (of either party) being BLM's obligation to transfer the Property in question – via a land patent – to Silver State.[43]  Indeed, the government repeatedly concedes that the parties formed a valid contract.  *See* Mot. to Dismiss at 26 ("The Parties Had An Express Auction-Sale Contract"); Def. Reply at 1 ("Silver State won the restricted auction, and the BLM and Silver State ultimately agreed on a closing date…"); Tr. at 13:10-15 ("THE COURT: Does the government agree that upon payment – the final payment of the full purchase price, that at that point in time, there was a contract by Silver State with the United States for the purchase of the land in question?  MR. ROSENBERG: Yes.").[44]

Moreover, the government further agrees that, up until the Assistant Secretary made the decision to refuse to transfer the Property, BLM had a contractual obligation to convey the Property, via land patent, to Silver State.  Tr. at 18:14-19 ("THE COURT: If

---

not prevent the creation of mutual obligations after it accepted the defendant's offer."), *aff'd*, 253 F.2d 956 (2d Cir. 1958); *see also Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1019 (Fed. Cir. 1996) ("That the government's promise to issue the loan guarantee was contingent upon High Plains and Wells Fargo's performance of numerous conditions does not make the promise any less binding.  Indeed, the essence of a unilateral contract is that one party's promise is conditional upon the other party's performance of certain acts and when the other party performs, the first party is bound.").

[42] *See* Def. Reply at 5-6 ("[T]he [NORA], Silver State's sealed written bid, the BLM's acceptance decision, and the escrow instructions are contract documents that 'supply' relevant terms of the agreement.").  Although the Court assumes for the purposes of resolving the government's motion that the entire NORA was included in the parties' contract, the Court's view is that the NORA's *Terms and Conditions* section was the only section of that document governing the parties' contractual obligations following Silver State's tendering full payment of its promised purchase price.

[43] *See* Def. Mot. at 1 ("Silver State performed its end of the transaction by timely making final payment of the purchase price.").

[44] "'[A] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'"  *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., Md.*, 608 F.3d 183, 190 (4th Cir. 2010)); *see Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed. Cir. 2014) (questioning the Veterans Court's "reluctance to accept [a] concession" made at oral argument and citing case law for the proposition that admissions are generally binding on the parties).

you had asked an official at BLM what is left to do under this now formed contract, the answer is, the government's duty under the contract . . . [i]s to convey the property. MR. ROSENBERG: Correct."). Nor could the government plausibly contend otherwise, given that the Agency memorandum recommending that the Assistant Secretary terminate the parties' contract admitted that Silver State's payment of the purchase price balance into escrow "triggered the *requirement* that the BLM issue the patent within 30 days, by December 28, 2012." Appx. A190 (emphasis added).

As noted above, although the parties executed multiple written agreements to extend the government's deadline to issue the patent, not one of those bilateral agreements ever rescinded the initial escrow term obligating the Agency to transmit the land patent, or even suggested that the Agency had the power to terminate – or otherwise was considering terminating – the contract. *See* Appx. A96 (agreement that, upon timely payment, "BLM will then provide the patent . . ."); *id.* at A106-07, 162-63, 183-85.

"[A] breach of contract is a failure to perform a contractual duty when it is due." *Trauma Serv. Grp.*, 104 F.3d at 1325. Silver State alleges that the parties' contract required the Agency to deliver the patent for the Property to Silver State by May 13, 2013 and that the Agency failed to perform this contractual duty. Compl. ¶¶ 43-44; *see* Tr. at 95:13-14 (government asserting that "[t]here was no termination of the contract[,]" but conceding that "[t]here was an order not to perform").

Thus, the only questions that remain are whether, as the government argues, it nevertheless may avoid Silver State's claim for breach of contract, as a matter of law, because: (1) the contract between the parties incorporated statutory or regulatory provisions (or contained some other term) that permitted the Agency to  decline to convey the Property (or to otherwise cancel the parties' land sale contract), notwithstanding that Silver State fulfilled all of its contractual obligations; (2) judicial findings in the prior APA litigation between the parties foreclose Silver State's breach of contract claim here; or (3) Silver State already has received a full refund of its bid price paid to the government and cannot demonstrate entitlement to any further damages. The Court rejects each of these arguments, as well as the other grounds for dismissal that the government presents in its motion.

### B.      The Government Has Not Identified Any Contract Term Excusing The Agency's Performance Or Otherwise Permitting The Agency To Avoid Liability For Breach Of Contract

The government's primary contention in support of its motion to dismiss is that "Silver State's claims hinge on the [sic] whether the modified competitive sale . . . was

lawful on the sale's closing date" – *i.e.*, the date on which BLM was required to convey the land patent for the Property to Silver State. Def. Reply at 9. In particular, the government maintains that the contract at issue incorporated 43 U.S.C. § 1713(f). According to the government, that statutory provision, when amalgamated with the Secretary's power in 43 U.S.C. § 1457 (and 43 U.S.C. § 2), gave the Agency the contractual power (1) to reassess its decision to solicit offers utilizing modified competitive bidding procedures at any point in time prior to conveying the patent for the Property, and (2) to withhold the land patent from Silver State without breaching the contract, even after Silver State completed payment, if the Agency determined that modified competitive bidding procedures should not have been employed. Def. Reply at 1, 12 (arguing that, "by making section [1713] a term of the auction sale contract, the parties conditioned the BLM's duty to deliver the patent on the Secretary's final judgment that the sale met the statute's requirements"); Def. Mot. at 30 ("The Secretary (acting through the Assistant Secretary) relied on [43 U.S.C. § 1457(4), (13)] to order the cancellation of the unlawful sale to Silver State"); Tr. at 37:1-38:5 (referencing "Section 2 and Section 1457 of Title 43").[45] The government's argument all but completely hinges on whether the parties incorporated 43 U.S.C. § 1713(f) into their contract. Tr. 37:12-15; 39:10-11; 90:2-12; 91:4-8.

The Court need not resolve the full metes-and-bounds of the parties' contractual undertakings or decide with surgical precision which sentences in the NORA or other documents are included (or not) in the parties' contract. Rather, as noted above, the Court assumes here – for the purposes of resolving the government's motion – that all of the above-referenced documents constitute the contractual documents binding upon the parties, and holds only that: (1) 43 U.S.C. § 1713(f) was *not* incorporated in the parties' contract as a contract term; (2) even if that statutory provision or its related implementing regulations were considered contract terms, they cannot be interpreted to excuse the government's failure to transfer the Property; and (3) no other contract term or other statutory or regulatory authority identified by the government at this stage of the case permits the government to avoid contractual liability.[46]

---

[45] Tr. at 18:14-19:10 (arguing that "the only way there's no breach of contract is if there is a term of the contract that exempts . . . the Government from conveying the property" and that the term which so exempted the government here is 43 U.S.C. § 1713(f)).

[46] "When the performance of a duty under a contract is due, nonperformance of that duty is a breach of the contract." *Century Expl. New Orleans, LLC v. United States*, 110 Fed. Cl. 148, 163 (2013) (citing Restatement (Second) of Contracts § 235 (1981)), *aff'd*, 745 F.3d 1168 (Fed. Cir. 2014).

1.    **The Parties' Contract Did Not Incorporate 43 U.S.C. § 1713(f)**

As the government forthrightly concedes, "Silver State performed its end of the transaction by timely making final payment of the purchase price."  Def. Mot. at 1.  At that point – and, as noted above, the government agrees – the only remaining contractual duty belonged to the Agency (*i.e.*, to convey the Property's title to Silver State via a land patent).  Appx. A190; Tr. at 18:14-19 ("THE COURT:  If you had asked an official at BLM what is left to do under this now formed contract, the answer is, the government's duty under the contract . . . is to convey the property.  MR. ROSENBERG: Correct.").

Nevertheless, the government asserts that it had the contractual power to not convey the land patent for the Property to Silver State – and otherwise avoid liability for breach of contract – based on 43 U.S.C. § 1713(f) because it was a term of the parties' contract.  Def. Mot. at 47; Tr. at 37:12-15 ("THE COURT:  [D]oes the government's case here in terms of no breach hang on 1713(f) alone, or no?  MR. ROSENBERG: Yes.  It does depend on 1713(f).").

The Court rejects the government's argument.  *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343 (Fed. Cir. 2008) (whether a statute is incorporated "by reference is a question of law").

For a contract to incorporate a document or statutory provision, "the incorporating contract must use language that is *express and clear, so as to leave no ambiguity* about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract."  *Id.* at 1344 (emphasis added); *see also St. Christopher Assocs. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (holding that a general reference to the agency's regulations did not incorporate a specific regulation promulgated by the agency or a specific section of the agency's handbook); *Smithson v. United States*, 847 F.2d 791, 794–95 (Fed. Cir. 1988) (holding that a contract did not incorporate an agency's regulations, despite the statement in the contract that it was "subject to the present regulations of the [agency] and to its future regulations not inconsistent with the express provisions hereof").

In *St. Christopher Associates*, the Federal Circuit explained that it is "reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation."  511 F.3d at 1384 (discussing *Smithson*, 847 F.2d at 794).  The Federal Circuit's rationale, as articulated in *Smithson*, is that wholesale incorporation of regulations into a contract would allow a contracting party to "choose among a multitude of regulations as to

which he could claim a contract breach—and thus '[a] wholly new ground of obligation would be summarily created by mere implication.'"  847 F.2d at 794 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1010 (Ct. Cl. 1967)).  The Federal Circuit's interpretive rule, in that respect, thus protects the government, as well as plaintiff contractors.

Moreover, even a contract's reference to a specific statutory provision will not suffice to incorporate that provision into the contract.  In that regard, the Federal Circuit has made crystal clear that its:

> cases support a principle in our Circuit that the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and *must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract* (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history).

*Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1345 (emphasis added).  In *Southern California Edison Co. v. United States*, 226 F.3d 1349 (Fed. Cir. 2000), for example, "the contracts-in-suit *did* incorporate the terms and conditions of certain regulations by specifically referring to the regulations (the text of which was attached to the contract as an exhibit) 'as fully and completely as though set forth herein [i.e., in the contract] in length[.]'"  *Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1344 (emphasis added) (quoting 226 F.3d at 1353).[47]

The Court finds that none of the documents – or provisions within those documents – that comprise the parties' contract at issue contains language that come close to meeting the Federal Circuit's standard for incorporation of 43 U.S.C. § 1713(f) by reference.

The government points to the NORA, but it contains nothing more than a passing reference to 43 U.S.C. § 1713 generally in the "Summary" section of the Federal Register entry containing the NORA.  Appx. A73 (77 Fed. Reg. at 20,413).  In particular, the "Summary" merely notes that "[t]he sale [not the contract] will be subject to the applicable provisions of . . . 43 U.S.C. 1713, and BLM land sale regulations at 43 CFR 2710."  *Id.*  Thus, even assuming that BLM intended to incorporate that "Summary"

---

[47] The government's supplemental brief contains a passing reference to *Smithson*, 847 F.2d at 794, Def. Supp. Br. at 2, but does not otherwise address that case or subsequent Federal Circuit cases squarely on point.

language into the parties' resulting contract, the "Summary" recites mere "background law" (regarding how BLM would invite offers), the very type of language that the Federal Circuit in *Northrop Grumman*, 535 F.3d at 1345, held does *not* constitute incorporation language. Such language is very far, indeed, from the type of incorporation language the Federal Circuit approved in *Southern California Edison*, 226 F.3d at 1353. And, while the Federal Circuit "does not require 'magic words' of reference or of incorporation," the NORA's language falls well-short of the "widely-used and judicially-approved language of incorporation, such as 'is hereby incorporated by reference' or 'is hereby incorporated as though fully set forth herein,'" which the Federal Circuit has recommended agencies adopt to "avoid or at least minimize the risk of having to litigate this issue." *Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1346.

Moreover, there is no reference – bare or otherwise – to 43 U.S.C. § 1713, let alone specifically § 1713(f), elsewhere in the NORA. In particular, the NORA does not reference 43 U.S.C. § 1713 in its "*Terms and Conditions*" section, which the Court views as the only section of that document governing the parties' contractual obligations following Silver State's tendering full payment of its promised purchase price.

In sum, the NORA does not "clearly communicate that the purpose of the reference" to 43 U.S.C. § 1713 "is to incorporate the referenced material into [a resulting] contract." *Id.* at 1345. And there is nothing whatsoever in the NORA's passing reference to 43 U.S.C. § 1713 pointing specifically to § 1713(f) as an "applicable term" that might govern the parties' future performance obligations under the contract.

Although the bilateral August 17, 2012 escrow instructions also make a passing, general reference to 43 U.S.C. § 1713 (but not specifically to 43 U.S.C. § 1713(f)) – and albeit mistakenly citing to § 1716[48] – that document likewise does not contain any language remotely approaching the type of explicit incorporation phraseology approved by the Federal Circuit in *Southern California Edison*. The Court, again, is cognizant that no "magic words" are required *per se*, *Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1346, but the escrow instruction document includes the relevant statute as part of what amounts to "background language," noting simply that "[t]he following instructions are prepared for use in processing a land patent through escrow . . . pursuant to [43 U.S.C. § 1713]." Appx. A96. The document does not specifically

---

[48] *See* Tr. at 32:9-16 ("THE COURT: . . . . the escrow instructions . . . miscite[] the code provision of 1716. MR. ROSENBERG: It does. THE COURT: It should be 1713. MR. ROSENBERG: Correct.").

identify 43 U.S.C. § 1713(f) as a term governing the parties' future rights or performance obligations under the contract.

In any event, the paragraph in the escrow instructions referencing the statute strongly undermines the government's position.  In that bilateral agreement – that the parties concur is included in the resulting land sale contract – the parties specifically agreed that "[t]he transaction is found to be in the public interest and otherwise in conformance with the laws and regulations."  Appx. A96.  Given that the parties also agreed that "[a]ny changes to these instructions must be in writing and signed by the [sic] all the parties named below[,]" the government would have to explain how the bare reference to § 1713 generally reserved to the Agency a unilateral contract right sufficient to (1) override the parties' agreed-upon finding regarding the transaction's "conformance with [applicable] laws and regulations," (2) revisit the previous BLM determination that modified competitive bidding procedures were appropriate, and (3) refuse to convey the land patent to Silver State, while avoiding contract liability.  *Id.*  The government, however – aside from insinuating that the parties' joint finding was premature – makes no real effort to reconcile the sentence referencing the statute, the parties' contractual finding regarding the legality of the transaction, and the government's subsequent invocation of the statute to attempt to avoid liability for breach of contract.[49]

The government, in its motion to dismiss, even relies upon the legality finding in the escrow instructions, but fails to acknowledge that the escrow instructions were executed by both parties, formed part of the parties' contract at issue, and could only be amended by further agreement in writing.  S*ee* Def. Mot. at 49 (quoting Appx. A96).  The government asserts that "[t]he escrow instructions . . . confirm the parties' agreement that only a lawful sale would be consummated," and "that the lawfulness of the sale was reviewable after the modified competitive sale had been initially authorized," *id.*, but the escrow instructions contain no such language at all.  Again, the government ignores: (1) that the land *sale* already had been completed; (2) the only explicit contract language is the parties' agreement regarding the lawfulness of the

---

[49] *See* Def. Supp. Br. at 2; Tr. at 33:14-17 ("MR. ROSENBERG: Well, these escrow instructions were executed before the change in circumstances that rendered the sale to be out of compliance with Section 1713(f)."); *id.* at 34:11-21 ("THE COURT: So the government's contention is that the invocation of 1713(f) . . . beats, in some sense, [the contractual finding that the sale was lawful]? [The government] has to.  MR. ROSENBERG: Yes, but those are not inconsistent.  They're not inconsistent.  So[,] the change in circumstances that rendered the sale to be out of compliance with 1713(f) happened months after this recital about the sale being found to be in the public interest and otherwise in conformance with the laws and regulations.").

transaction; and (3) the government's decision to refuse to issue the land patent occurred *after* Silver State tendered the full contract price.

The government might well have contended – and perhaps the Court could have been persuaded to agree – that the legality-and-public-interest finding itself constitutes nothing more than unenforceable preamble language. *Lurline Gardens Ltd. Hous. P'ship v. United States*, 37 Fed. Cl. 415, 420 n.7 (1997) ("A recital that an agreement is governed by or executed pursuant to a set of regulations does not incorporate those regulations into the agreement." (internal citations omitted)). But, the legality-and-public-interest finding is in the same paragraph as the statutory citation. The government cannot have its cake and eat it too, reading some parts of the relevant escrow agreement paragraph into the parties' contract, and other parts out.

In any event, the government somewhat incredibly urges dismissal of Silver State's suit based on a later, *unilateral* determination of the Agency under 43 U.S.C. § 1713(f), notwithstanding the government's concession that the finding of legality was part of the parties' signed contract. Tr. 33:25-34:10 ("THE COURT: The secretary agrees in [the] contract that the transaction is in the public interest and in conformance with the law. MR. ROSENBERG: That's right."). The contract did not provide the Agency with such power.

The government, in its supplemental brief, relies upon the United States Supreme Court's decision in *Mobil Oil Expl. & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 614 (2000), for the proposition that "language making an agreement 'subject to' a specific statutory or regulatory provision suffices to incorporate that provision into the contract." Def. Supp. Br. at 2. The Supreme Court, however, held no such thing; and, indeed, nothing in the Federal Circuit's subsequent jurisprudence suggests such a reading of *Mobil Oil*. *See Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1344 (discussing incorporation precedent and citing *Smithson*, 847 F.2d 791, with approval, for the proposition that a clause which provided that the "agreement is subject to the present regulations . . . is hardly the type of clause that should be read as incorporating fully into the contract all the [agency] regulations"). In that regard, the government's supporting parenthetical quotation from *Mobil Oil* omits a critical part of the Supreme Court's summary, specifically the emphasized part of this quote: "***The Government does not deny*** that the contracts, made 'pursuant to' and 'subject to' [the Outer Continental Shelf Lands Act (OCSLA)], incorporated OCSLA provisions as promises." 530 U.S. at 614 (emphasis added).

Thus, in *Mobil Oil*, and contrary to the government's suggestion, the Supreme Court did not *hold* that "pursuant to" and "subject to" are sufficient phrases, in and of themselves, to trigger a statute's incorporation into a contract by reference. Rather, the

question of incorporation by reference simply was not contested in the *Mobil Oil* litigation. Indeed, the trial court's decision in that case demonstrates that there was a great deal of additional contract language supporting incorporation by reference of the statute at issue, thus making it hardly surprising that the parties in that case did not litigate the issue. *See Conoco Inc. v. United States*, 35 Fed. Cl. 309, 318 (1996) ("In regard to performance, Sec. 10 of the leases contain[s] a provision requiring that the lessees comply with all regulations and orders relating to exploration, development and production. The lease terms also contain a provision in Sec. 13 stating, 'The Lessor may suspend or cancel this lease pursuant to Section 5 of the [OCSLA] and compensation shall be paid when provided by the Act.'").[50]

Further still, the NORA does not make the parties' resulting contract "subject to" 43 U.S.C. § 1713(f); rather, the "Summary" section of the NORA merely provides that "[t]he ***sale*** will be subject to the applicable provisions of Sections 203 of the [FLPMA] and BLM land sale regulations at 43 CFR 2710." Appx. A73 (emphasis added). And, as explained above, the NORA itself contemplated that the "sale" concludes when the Agency receives bids – and, at the latest, upon BLM's acceptance of a bid – pursuant to the modified competitive sealed-bid process. *Id.* at A74 ("Within 30 days of the *sale*, the BLM will, in writing either accept or reject all bids received." (emphasis added)); *see also* 43 C.F.R. 2711.1-2 (providing that a "[NORA] offering for sale a tract or tracts of public lands identified for disposal by sale shall be issued, published and sent to parties of interest by the authorized officer not less than 60 days *prior to the sale*" (emphasis added)). The Court need not decide the precise meaning of "sale" in the context of the NORA; it is sufficient that "sale" clearly means something different from – and occurs earlier than – "consummation" or "conveyance." *See Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 990 (Fed. Cir. 2009) ("A proper interpretation of a contract generally assumes consistent usage of terms throughout the Agreement."); *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 980–81 (Fed. Cir. 2002) ("This contention has some force, as it appeals to the maxim that the construction

---

[50] The government also cites *Pub. Hous. Authorities Directors Ass'n v. United States*, 130 Fed. Cl. 522 (2017). *See* Def. Supp. Br. at 2. That decision does not support the government's position. To the contrary, that case involved a contract that expressly incorporated regulations as contractual obligations, employing just the type of incorporation language the Federal Circuit has approved. 130 Fed. Cl. at 532 ("Thus, section 5 of the [agreements] specifies that the parties must comply with the regulations 'promulgated by HUD at Title 24 of the Code of Federal Regulations, which are hereby incorporated into this [agreement] by reference as if fully set forth herein, and as such regulations shall be amended from time to time.'" (emphasis in original)).

of any legal document—like a statute, contract or patent—should try to give meaning to every term in that document; otherwise, a lawyer or court will have erred by reading the chosen words of the document into oblivion."); *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998) ("We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning."); *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."); *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (rejecting contract interpretation that "strips the provision of its plain meaning").

In sum, the Federal Circuit's binding rule regarding incorporation by reference is straightforward:

> To incorporate material by reference, a contract must use clear and express language of incorporation, which *unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract.*

*Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) (emphasis added).  No contractual document at issue here contains the type of "clear and express language of incorporation" that "unambiguously communicates" that the parties intended to incorporate 43 U.S.C. § 1713(f) into their contract.

Accordingly, the Court rejects the government's argument that the parties incorporated 43 U.S.C. § 1713(f) into their contract, such that the government could invoke that provision to unilaterally terminate Silver State's contract without contractual liability.

## 2.      43 U.S.C. § 1713(f) Was Not an Implied Term of the Parties' Contract

The Court rejects not only the government's argument that "[t]he parties *expressly* manifested their intent to condition the BLM's delivery of the patent on a favorable 'necessary and proper' determination[,]" Def. Mot. at 47 (emphasis added), but also the government's assertion, in the alternative, that a condition precedent to performance by a party may be implied.  *Id.* ("The 'intention to make a duty conditional may be manifested by the general nature of [the] agreement' itself." (quoting Restatement (Second) of Contracts § 226 cmt. a) (alteration in original)).  Notably, the

government cites no decision – from this Court,[51] the Federal Circuit, or any other court for that matter – supporting its argument that a condition precedent should be implied based on the "general nature" of the parties' agreement.

This Court will not extract by implication from the parties' written agreement a condition precedent untethered to any of the contract's terms.[52]

Silver State observes that the NORA included a provision in the "*Terms and Conditions*" section indicating that "[t]he conveyance of this parcel will not be on a contingency basis."  Appx. A75; Compl. ¶ 13.  The government asserts that "this phrase" – referred to herein as the "no contingency" language – "plainly concerns a transfer of *ownership* made contingent upon . . . potential future uses of the land."  Def. Mot. at 48 (emphasis in original).  The government further argues that Silver State cannot reasonably construe that phrase "to impair the Secretary's statutory duty [pursuant to 43 U.S.C. § 1713(f)], embodied in the contract."  *Id.* at 49.  Although for the purposes of resolving the government's motion this Court does not definitively interpret the "no contingency" language here, the government gives Silver State's invocation of that phrase very short shrift, *see id.* at 48-49, merely begging the question whether 43 U.S.C. § 1713(f), in fact, is "embodied in the contract" – a premise this Court already has rejected.  *Id.*  Moreover, even if the contract at issue had incorporated that statutory provision, there is another, more plausible interpretation.  In particular, § 1713(f) cannot be read – in light of the "no contingency" language – to provide BLM with a post-contract formation reservation of rights to revisit and effectively nullify the Agency's earlier, legally valid decision to enter into a contract with Silver State via modified competitive bidding.

Were this Court to read the parties' contract as containing an implied condition precedent – in the form of the Agency's power to engage in a post-contract formation "necessary and proper" (re-)determination – the Court effectively would be holding that the MPA itself constituted a term of the NORA and the parties' resulting contract.  *See* Def. Reply at 16 (asserting "the land sale's complete dependence on the existence of the MPA itself").  That certainly seems to have been BLM's effective assumption as

---

[51] This Court was able to locate only one decision even referencing that putative rule.  *See Korea Dev. Corp. v. United States*, 9 Cl. Ct. 167, 176 (1985) (quoting 2 Restatement of Contracts, Second, § 226 (1981), but noting that "the contract language itself . . .  spells out the condition precedent").

[52] For the reasons explained *infra*, Section III.B.3., the Court rejects the government's suggested textual hook – the lone word "sale" – underpinning the assertion that BLM had a continuing contractual right to revisit its decision to engage in a modified competitive bidding process until issuance of the land patent.

articulated in its Recommendation Memorandum.  Appx. A193 ("[E]ven though the modified competitive bidding procedures did not guarantee that Silver State was going to be the successful purchaser for the parcel, but for the now-terminated Development Agreement [*i.e.*, the MPA] and the parties' representations about that Agreement and their relationship, the BLM would not have agreed to utilize a modified competitive process in the first place.").[53]

The fatal flaw in the government's position is that the reason the MPA was not incorporated into the parties' contract is that the NORA provided for a modified competitive bidding process, contemplating that bidders other than Silver State could purchase the land.  If the Court accepts, as it must, the presumption that BLM was acting in good faith,[54] the Agency by definition recognized the possibility that a bidder other than Silver State could have been selected as the high-bidder and thus form a contract with BLM for the Property.  That being the case, the Court finds it difficult to understand how the MPA could have been so critical to the parties' contract, when no other potential purchaser would have been bound by the MPA pursuant to the NORA.

Moreover, had the Agency wanted to reserve to itself the right to cancel the parties' agreement without liability, the Agency well knows how to write such a NORA.  In Notice of Realty Action: Non-Competitive Sale in the Las Vegas Valley, NV, 71 Fed. Reg. 74,554-03 (Dec. 12, 2006),[55] BLM proposed to sell a "parcel under direct sale procedures in accordance with the applicable provisions of the [FLPMA]."  71 Fed. Reg. at 74,555 (noting that "the direct sale method is supported by 43 CFR 2711.3-3(1)").[56]  In

---

[53] The Court notes that BLM, in its recommendation memorandum, raised questions about Silver State's "veracity" – with respect to its "initial representations about the Development Agreement" – "[s]ubsequent to *the completion of the sale process.*"  Appx. A193 (emphasis added).

[54] "The presumption that government officials act in good faith is enshrined in our jurisprudence."  *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013).

[55] The Court takes judicial notice of this Notice of Realty Action "because it is a government record published in a reliable source, the Federal Register."  *Fairholme Funds, Inc. v. United States*, 147 Fed. Cl. 1, 21  n.6 (2019) (citing *Murakami v. United States*, 46 Fed. Cl. 731, 739 (2000), *aff'd*, 398 F.3d 1342, 1354-55 (Fed. Cir. 2005); *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019); Fed. R. Evid. 201).  "Although a motion to dismiss is normally limited to the allegations in a complaint, the court may consider facts derived from sources subject to judicial notice without converting the motion into one for summary judgment."  *Fairholme Funds, Inc.*, 147 Fed. Cl. at 21 n.6 (citing *Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999)).

[56] Appx. A26-27 (BLM rejecting Henderson's request that BLM utilize direct sale procedures).  The distinction between direct sale and modified competitive bidding is immaterial for the Court's point, which is that BLM knows how to build in contingencies to its NORAs but declined to take the necessary steps here.

particular, BLM "proposed to [sell land] to Clark County for affordable housing purposes." *Id.* Significantly, that NORA omitted the "no contingency" language Silver State cites in its Complaint, and expressly provided for a number of "terms, covenants, and conditions" restricting Clark County's use of the land following the sale, as follows:

> 2. Clark County hereby covenants and binds all successors-in-interests to use the land conveyed only for affordable housing purposes for a period of fifteen (15) years . . . . This affordable housing covenant shall be deemed appurtenant to and to run with the ownership of the land conveyed. It shall be binding upon Clark County, its successors and assigns, during the time each owns the land.

> 3. If, at the end of five (5) years from the date of the sale Patent, any land conveyed through this proposed sale is not being used for affordable housing purposes, at the option of the United States, those lands not so used shall revert to the United States, or, in the alternative, the United States may require payment by the owner to the United States of the then fair market value.

> 4. All land conveyed shall be used only for affordable housing purposes during the period of affordability. If at any time all or any portion of the land conveyed is used for any purpose other than affordable housing purposes by Clark County, or any successor-in-interest, at the option of the United States, those lands not used for affordable housing purposes shall revert to the United States . . . .

> 5. This use restriction and the reversionary interest may be enforced by the BLM[.]

*Id.*

Completely putting aside the significance of the "no contingency" language BLM omitted from the "direct sale" NORA summarized above, BLM quite clearly knows how to – and does – employ express language in its land sale auctions and the resulting contracts to make the promised conveyance contingent on particular usage of the sold land. In Silver State's case, Henderson even requested a direct sale. Appx. A22. BLM, however, declined to engage in that type of sales process or transaction, declined to include any express contingency, and, in particular, made no attempt to subject Silver State's bid or the Agency's resulting acceptance to any particular post-purchase usage

requirement.  Accordingly, the Court similarly declines to read such language into the parties' agreement or to otherwise infer a condition precedent that was not met.[57]

3.      **Even Assuming 43 U.S.C. § 1713(f) Or Its Implementing Regulations Were Incorporated In The Parties' Contract, The Government Did Not Have The Contractual Right To Terminate The Land Sale Contract At Issue**

Even assuming that the parties' contract incorporated 43 U.S.C. § 1713(f) or its implementing regulations as contract terms, nothing in the plain language of 43 U.S.C. § 1713 or its implementing regulations – even broadly construed – supports the government's position here.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)); *Sunoco, Inc. v. United States*, 908 F.3d 710, 715 (Fed. Cir. 2018) ("When the words of a statute are unambiguous, then, this first canon is also the last." (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)), *cert. denied*, 140 S. Ct. 46 (2019)).

First, as a general matter, the Court views 43 U.S.C. § 1713 as directing the Agency's conduct in the land sale *process*, as the NORA itself suggests, but absolutely nothing in the statute's plain language provides any terms akin to a post-bid acceptance contract clause.  Nor can that statutory provision plausibly be read to confer post-contract formation rights on either party, and certainly not termination rights in favor of the government after the Agency has accepted a bidder's offer pursuant to the procedures that the Agency selected and after that bidder has tendered the full price, as Silver State did in this case.  *Cf. Technitrol, Inc. v. United States*, 440 F.2d 1362, 1374 (Ct. Cl. 1971) (discussing a patent and noting that "[t]he clause, as worded here, does not purport to extend its reach chronologically, by mortmain, into the indefinite future.").

The government agrees that the "FLPMA does not prescribe any clauses for inclusion in authorized land-sale contracts[,]" but argues that the "FLPMA simply defines the Secretary's statutory authority to dispose of Federal public lands, including the conditions that must be met and the procedures that must be followed *before* selling

---

[57] If anything, this would appear to be a case of seller's remorse.  Appx. A193 (admitting that the Agency was not *revisiting* or *revising* its "necessary and proper" decision, *per se*, so much as concluding that "[a]bsent Silver State's and Henderson's representations [about the MPA], the BLM *would have* likely sold the nominated parcel" via a different process (emphasis added)).

land out of Government control." Def. Supp. Br. at 3-4 (emphasis added). The Court agrees in-part and disagrees in-part. The government is correct that the statute defines the Agency's statutory authority to sell Federal land. The Court further agrees that certain procedures must be followed "*before* selling" such land. *Id.* The Court holds, however, that the government's critical error is with regard to whether a "sale" already had occurred when the government finally repudiated its contractual obligation to issue the land patent to Silver State. As the Court's decision demonstrates, the sale at issue was complete – and the parties had formed a contract – long before the government repudiated the contract.[58]

Second, § 1713(f), in particular, provides only that the Agency shall conduct "[s]ales of public lands under this section" using "competitive bidding procedures" unless the Secretary "determines it necessary and proper" to sell "lands with modified competitive bidding or without competitive bidding." 43 U.S.C. § 1713(f). Contrary to the government's proposed interpretation of that provision, § 1713(f) only requires a "necessary and proper" decision *prior to* initiating the sale process via the NORA; there is no language even hinting at the Agency's power to revisit and undo its decision to engage in modified competitive bidding after (1) the Agency already has accepted a bid and (2) the winning bidder has paid the full purchase price.

The government agrees that "[t]his 'necessary and proper' determination must be made by the BLM before holding a modified competitive auction," but maintains that such a determination "may be revisited and reversed by the Secretary *at any time before the patent issues*." Def. Mot. at 6. The government, however, points to no operative statutory language whatsoever supporting its expansive reading, aside from relying on § 1713(f)'s reference to a single word – "sales." Def. Mot. at 46 n.13. The government's view is thus: "sale" means every action up to and including BLM

---

[58] Significantly, this holding is entirely consistent with the central holding of the district court and circuit court in the APA litigation that the Agency retained the power and acted reasonably – under various statutory and regulatory authorities – to refuse to transfer the patent. *See, infra*, Section IV. In other words, whether a court may order the Agency to transfer the Property "out of Government control" is a question that is separate and distinct from the issue of whether the government was contractually obligated to do so, and must therefore pay breach damages for failing to do so. Notably, while the district court had the power to issue an injunction to order the Agency to comply with the law – were it found to be in violation – neither this Court nor the district court has the power to order specific performance of the contract itself, while *only* this Court has the power to award contract damages. *Kanemoto v. Reno*, 41 F.3d 641, 644–45 (Fed. Cir. 1994) ("The remedies available in [the Court of Federal Claims] extend only to those affording monetary relief; the court cannot entertain claims for injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances not here pertinent.").

conveying the land patent to the purchaser, and § 1713(f)'s directive that the Secretary "may sell . . . land[] with modified competitive bidding" where the Secretary "determines it necessary and proper" means that the Secretary may revisit that determination at any point prior to transfer of the land patent.   That lone word "sale," however, does not secretly encode an escape hatch for the Agency, at least not as defined in the context of the statute, the regulations, the NORA, or the other documents upon which the government itself has relied here.   To the contrary, BLM repeatedly refers to the NORA itself as the "proposed sale" and to the Agency's acceptance of a sealed-bid as constituting "*the* sale":

- "The successful bidder will be allowed 180 calendar days from *the date of the sale* to submit the remainder of the full purchase price."   Appx. A74 (emphasis added).

- "Within 30 days *of the sale*, the BLM will, in writing, either accept or reject all bid received."   *Id.* (emphasis added).

- "No contractual or other rights against the United States may accrue until the BLM officially accepts the offer to purchase, and the full bid price is submitted by the 180th day *following the sale*."   Appx. A75 (emphasis added).

- "The remainder of the full bid price for the parcel must be received no later than 4:30 p.m., Pacific Time, within 180 days *following the day of the sale*."   *Id.* (emphasis added).

The NORA also refers to when lands are "[c]onveyed out of Federal ownership," thus making a clear distinction between the date of sale and the conveyance.   *Id.* at A76; *see also* Tr. at 26:1-4 (government conceding that 43 U.S.C. § 1713(f) does not use the phrase "consummation of sale").

Accordingly, while the government focuses on the definition of "sale" in isolation, its argument ignores that parties may enter into a *contract for sale* that results, ultimately, in a conveyance.   In that regard, the need for a conveyance presumes the existence of a prior agreement or sale.   *See, e.g., Conveyance*, Black's Law Dictionary (11th ed. 2019)  ("The transfer of a property right that does not pass by delivery of a thing or merely by agreement."); *Contract*, Black's Law Dictionary (11th ed. 2019) (defining the term to include a "[a] contract to sell goods at a future time"); *Lavi v. Pelican Inv. Corp.*, 36 F. App'x 923, 924 (9th Cir. 2002) (holding that a particular "document operate[d] as an agreement to transfer the property in the future rather than an immediate conveyance").

Third, BLM's own contemporaneous documents support Silver State's position here.   BLM's June 12, 2012 Acceptance Letter refers to June 4, 2012, when BLM opened

and considered bids, as "the sale date."  Appx. A95.  Moreover, even the Recommendation Memorandum to the Assistant Secretary – in which BLM officials first recommended that the Agency "not issue the patent to Silver State" – refers to the date of bid acceptance (June 12, 2012) as "*following* a modified competitive sale."  *Id.* at A189 (emphasis added).  If that was not sufficiently clear contemporaneous evidence of the Agency's views, the Recommendation Memorandum explicitly recounts that "the parcel *was sold* using a modified competitive process."  *Id.* (emphasis added); *see id.* at A190 ("The modified competitive sale was held on June 4, 2012."); *id.* at A193 (noting that the government declined to transfer the land patent "*[s]ubsequent to the completion of the sale process*" (emphasis added)); *see also Reliable Contracting Grp., LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1332 (Fed. Cir. 2015) ("Generally, evidence of contemporaneous beliefs about the contract is particularly probative of the meaning of a contract."); *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation.").[59]

---

[59] A thought experiment is warranted here.  The Agency issued its final decision, declining to transfer the land patent to Silver State – and purporting to cancel the parties' transaction – on May 10, 2013, just three days prior to the revised, contractually agreed-upon due date for land patent delivery of May 13, 2013.  *Compare* Appx. A195, *with id.* at A183.  If the Agency had issued its final decision *after* the May 13, 2013 land patent due date, would the government now admit its breach of contract?  According to the government's position thus far, the answer to that question must be "no," given the government's assertion that the Agency reserved a right to revisit its decision to sell the land, and thus to cancel the sale without liability, all the way up until the Agency provided the land patent to Silver State.  If that is the case, however, was there ever a true contractual deadline – be it May 13, 2013, or any other – by which date the contract required BLM to provide the land patent to Silver State?  If the answer to that question is also "no," this Court would have to conclude that the parties' putative contract was illusory.  That is something this Court will not do, based on the law as explained above, as well as the record evidence the government included with its motion.  *See Hernandez v. Dep't of Def.*, 325 F. App'x 905, 908 (Fed. Cir. 2009) (declining to construe a "settlement agreement as giving the agency the option not to" perform because such an interpretation "would come close to rendering the settlement agreement illusory[,]" and holding that "[s]uch a construction is disfavored").  Alternatively, if the government concurs that May 13, 2013 constituted a hard deadline for BLM to provide Silver State with the land patent, where is the contractual language providing a limiting principle that the Agency may cancel the transaction without liability, but only until May 13, 2013?  Would not the power to entirely cancel the transaction *before* May 13, 2013 necessarily imply the lesser power to delay the conveyance until after that date if the "necessary and proper" determination remained under review?  And if that is the case, how could the government agree, to begin with, that May 13, 2013 constituted an enforceable deadline?  In short, the government's interpretive approach yields more questions than it answers.

Fourth, the regulation governing BLM's issuance of the NORA further confirms the Court's interpretation that the "sale" here occurred as early as the date upon which BLM opened the sealed bids, June 4, 2012, and certainly no later than bid acceptance on June 12, 2012, or Silver State's final payment on November 28, 2012.  *See* 43 C.F.R. § 2711.1-2(a) (providing that a "[NORA] offering for sale a tract or tracts of public lands identified for disposal by sale shall be issued, published and sent to parties of interest by the authorized officer not less than 60 days *prior to the sale*." (emphasis added)).

If the term "sale" in 43 U.S.C. § 1713(f) were meant to include the entire period up to BLM's conveyance of the Property, the implementing regulation would make no sense because a successful bidder has 180 days from bid opening to submit full payment.  But, if the government were correct, and "sale" includes the entire period up to conveyance, BLM could have issued the NORA *after* bid opening and acceptance; of course, that is nonsensical.  Clearly, the date of "sale" is the date of bid opening, and the NORA must be issued at least 60 days prior to that date, while the successful bidder must submit full payment no later than 180 days subsequent to that date.

The government's attempt to define "sale" in isolation, divorced from the entire context of the record – including the operative statutes and regulations – must be rejected.  *Sunoco, Inc.*, 908 F.3d at 715 ("Whether the statutory language is unambiguous is determined by the text itself, the context in which the language is used, and the statutory scheme as a whole."), *cert. denied*, 140 S. Ct. 46 (2019); *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning.").

If anything, 43 U.S.C. § 1713(f), its implementing regulations, and the NORA all support the Court's view that the parties entered a binding contract for the sale of the Property, *at the latest*, when Silver State tendered the full purchase price on November 28, 2012.  In that regard, the statute expressly limited the Agency's options following the receipt of sealed-bids.  The Agency may "accept[] or reject[]" . . . any offer to purchase" the land so long as it is "[1] in writing [and] . . . [2] *no later than thirty days after the receipt of such offer* . . . unless the offeror waives his right to a decision within such thirty-day period."  43 U.S.C. § 1713(g) (emphasis added).  "Prior to the expiration" of that 30-day period, "the authorized [Agency] officer" may even:

> *refuse to accept any offer* or may withdraw any tract from sale if
> he determines that: (1) *Consummation of the sale would be
> inconsistent with the provisions of any existing law*; or (2)
> Collusive or other activities have hindered or restrained free

and open bidding; or (3) Consummation of the sale would encourage or promote speculation in public lands.

43 C.F.R. § 2711.3-1(f) (emphasis added).[60]  Thus, the implementing regulation[61] covers the precise case that the Agency asserted with respect to Silver State – *i.e.*, where the "[c]onsummation of the sale would be inconsistent with . . . law" – and yet the government contends that there is no time limit cabining its power to terminate a contract for purchase of the Property.  Under the government's view of those provisions and the contract at issue – that the Agency somehow possessed a superseding power to terminate the transaction without liability at any time up to conveyance – the 30-day time limit is rendered entirely superfluous.  Put differently, the government fails to explain why the statute, regulation, and NORA would require the Agency to make a decision on particular bids – or the sale in general – "no later than 30 days after receipt" of offers, if a bid's acceptance can always effectively be revoked at a later date where the Agency changes its view of the transaction.  Those provisions "would be meaningless had [the regulations] simultaneously achieved the same end with silence." *Maine Cmty. Health Options v. United States*, __ U.S. __, 2020 WL 1978706, at *10 (U.S. Apr. 27, 2020).  Such an interpretation cannot be squared with the fundamental principle "of contract interpretation . . . that no contract provision is made inconsistent, superfluous, or redundant." *Lockheed Martin IR Imaging Sys., Inc.*, 108 F.3d at 322 (citing cases).

The text of the FLPMA's implementing regulation confirms the Court's reading of § 1713(f).  Although the government relies upon 43 C.F.R. § 2711.3-2 to argue that the Agency was permitted to revisit its decision to engage in modified competitive bidding at any time prior to conveyance, *see, e.g.*, Def. Mot. at 46, 49, the text of that provision weighs against the government's interpretation of § 1713(f).  In particular, § 2711.3-2(a) provides that "[p]ublic lands may be ***offered*** [by BLM] for sale utilizing modified competitive bidding procedures when the authorized officer determines it is necessary

---

[60] As detailed above, this language – or virtually identical language – was included in the NORA.  *See, e.g.*, Appx. A74 ("Within 30 days of the sale, the BLM will, in writing, either accept or reject all bids received.").

[61] Admittedly the implementing regulations – in terms of the incorporation issue – present a closer call given the repeated references to them in the NORA.  Appx. A74 (citing 43 C.F.R. §§ 2711.3-1(f), (g), 2711.3-2(a), (a)(1)(i), (c) in the "Supplementary Information" section); Appx. A75 (citing 43 C.F.R. § 2711.3-1(d)); Appx. A76 (citing 43 C.F.R. § 2711.3-1(f)).  But, similar to the statute itself, those regulatory provisions cover only "Procedures for Sale," and do not by their terms create any post-bid acceptance contractual rights or obligations in favor of either party.  *See* 43 C.F.R. § 2711.3 (Procedures for Sale).  Had Silver State taken exception in its bid to those regulatory sale procedures specified in the NORA, the bid may have been invalid – *i.e.*, in light of governing sealed-bid or auction law – but that does not mean the regulatory provisions yield post-contract formation rights.

in order to assure equitable distribution of land among purchasers or to recognize equitable considerations or public policies." 43 C.F.R. § 2711.3-2(a) (emphasis added). Thus, the "'necessary and proper' determination" – as the government calls it, *see* Def. Mot. at 46 – was a condition precedent only to BLM's decision to "offer[]" the Property for sale, which occurred when the Agency issued the NORA. And, § 2711.3-2(a), by its terms, only applies prior to, and perhaps while, the NORA is pending. Once the government's IFB ripens into a contract – at the latest following bid acceptance and the bidder's final payment – the "offer [of] sale" is no longer operative, and there is no predicate for the government to reconsider its chosen method of sale.

Indeed, the Agency's NORA further confirms that, even if the parties' contract had incorporated 43 U.S.C. § 1713(f) or its implementing regulations, such terms would not have provided the Agency with the authority to revisit its decision to utilize modified competitive bidding procedures at any point before patent issuance (*i.e.*, after the parties entered into the contract). In particular, the NORA provided that "[i]nterested parties may submit written comments regarding the proposed sale . . . until May 21, 2012." Appx. A73 (77 Fed. Reg. at 20,413). The NORA subsequently provided:

> Any adverse comments regarding the proposed sale will be reviewed by the BLM Nevada State Director or other authorized official of the Department of the Interior who may sustain, vacate, or modify this realty action. In the absence of any adverse comments, this realty action will become *the final determination* of the Department of the Interior.

*Id.* at A76 (77 Fed. Reg. at 20,416) (emphasis added). Thus, if 43 U.S.C. § 1713(f) or its implementing regulations provided the Agency with any contractual right to revisit its decision to utilize modified competitive bidding procedures, the contract documents provide that the Agency had to exercise that right prior to May 21, 2012. Put differently, the "adverse comments" provision, quoted above, suggests that there will be a singular final determination, not subject to continual reevaluation. *Erie Coal & Coke Corp.*, 266 U.S. at 520 ("The terms and conditions of the sale as set forth in the advertisement were binding alike upon the United States and the bidders.").

Accordingly, even assuming for the sake of argument that parties' contract incorporated the statutory or regulatory provisions, the Court holds that none of those provisions contains any language that even plausibly may be interpreted to provide the Agency with any contractual right to rescind its acceptance of Silver State's bid,

terminate the parties' resulting land sale contract, or to otherwise avoid contractual liability for failing to convey the subject Property to Silver State.[62]

### 4.      The NORA's Plain Language And Precedent Both Support This Court's Interpretation Of The Contract At Issue

The Court finds that yet another reason for rejecting the government's motion to dismiss is the repeated statement in the NORA that "[n]o contractual or other rights against the United States may accrue until the BLM authorized officer officially accepts the high bid offer to purchase and the full bid price is paid."  Appx. A74.[63]  The necessary implication – and, indeed, the only reasonable interpretation of that language – is that once BLM "accepts the high bid offer . . . and the full bid price is paid," the purchaser's contractual rights *do* accrue.  Given the government's admission that the only contractual duty remaining, once Silver State tendered the full purchase for the Property, was the government's obligation to issue the land patent to Silver State, when *would* contractual rights against the United States accrue?  The answer, according to the government, would seem to be "never" – or "almost never" – if the Court were to agree with the agency's putative continuing, near plenary *contract* power[64] to cancel the transaction without liability.  Not only is this Court unable to locate such a broad reservation of rights anywhere within the language of the contract documents or the governing statute or regulations, the government's interpretation would render the agreement at issue all but illusory, particularly in light of the parties' contractual finding that the transaction, in fact, was lawful.  *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1358 (Fed. Cir. 2009) (noting "the obvious question of whether making the contracts subject to whatever future federal law or policy may hold would make the contracts illusory"); *Hernandez*, 325 F. App'x at 908 (declining to construe a "settlement agreement as giving the agency the option not to" perform because such an interpretation "would come close to rendering the settlement agreement illusory[,]" and holding that "[s]uch a construction is disfavored" (quoting 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.22 at 234–35 (rev. ed. 1998) for the proposition that "'[w]hen the

---

[62] The absence of such contractual language stands in stark contrast to the advertisement at issue in *Erie Coal*, in which the government explicitly reserved, and thereafter exercised, the right to rescind a sale at auction prior to a specific date.  266 U.S. at 520-21.

[63] *See also* Appx. A75; 43 C.F.R. § 2711.3-1(g) ("Until the acceptance of the offer and payment of the purchase price, the bidder has no contractual or other rights against the United States . . . .").

[64] "Thus, the Secretary has the authority to ensure at every stage of a transaction (nomination, auction, acceptance and patent issuance) that each transfer of land out of federal ownership remains in the public interest."  Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Federal Defendants' Cross-Motion for Summary Judgment in *Silver State I* at 14, 2014 WL 12691273 [hereinafter "Def. Opp. in *Silver State I*"].

words of the contract indicate that a party has promised to perform, such words should not be interpreted so as to make the promise illusory, even if the context may show an intent to leave performance subject to the party's broad discretion.'")).

Several Department of Interior administrative tribunal decisions support the Court's conclusions here.  In *Exxon Corp.*, analyzing nearly identical contract terms to those at issue here (although dealing with the award of an oil and gas lease), the Interior Board of Land Appeals ("IBLA")[65] held that where the bidder "was obligated to tender the balance of the . . . bid . . . in 30 days[,]" and that otherwise a bid deposit would be forfeited, such a "forfeiture constitutes 'liquidated damages' assessed against a high bidder for failure to fulfill its contractual obligations."  97 IBLA 330, 335 (May 21, 1987).  Accordingly, "[t]he Government, on the other hand, by accepting the high bid bound itself to issuance of the lease upon submission by the high bidder of the necessary documents and balance of the [bid].  Indeed, without this mutuality of consideration, there would be no basis upon which to enforce the forfeiture of the bid deposit.  Thus, once the Government notifies a high bidder that the bid is acceptable, the Government has contractually obligated itself to issue the lease[.]"  *Id.*[66]

In *Chester F. Dawson*, 73 IBLA 27, 28 (May 9, 1983), the appellant applied to lease a 2.5-acre tract of land in Nevada.  BLM then sent the appellant a communication which invited the appellant "to purchase the tract and specified the procedure he should follow to do so."  *Id.*  The appellant "advised BLM that he wished to purchase the tract and submitted" payment in accordance with BLM's instructions.  *Id.* at 30.

---

[65] "The Interior Board of Land Appeals (IBLA) is an appellate review body that exercises the delegated authority of the Secretary of the Interior to issue final decisions for the Department of the Interior.  Its administrative judges decide appeals from bureau decisions relating to the use and disposition of public lands and their resources, mineral resources on the Outer Continental Shelf, and the conduct of surface coal mining operations under the Surface Mining Control and Reclamation Act."  Office of Hearings and Appeals, Dep't of the Interior, *About the Interior Board of Land Appeals*, https://www.doi.gov/oha/organization/ibla (last visited April 23, 2020).

[66] The government in this case makes no attempt to square its view of Silver State's contract rights with the NORA's provision entitling BLM to retain a successful bidder's deposit where that bidder fails to transmit the total purchase price by the deadline.  *See Warmuth*, 108 IBLA 130, 134-35 (April 3, 1989) ("[T]he District Manager duly notified appellant that his purchase of the property had been approved and his payment of the purchase price which BLM had established had been accepted.  It seems clear that, under 43 CFR 2711.3-1(g), at that point in time, contractual rights vested in appellant."); *Exxon Corp.*, 97 IBLA 330, 334-35 (May 21, 1987) ("[O]nce the authorized officer has communicated acceptance of a high bid he is thereafter estopped from rejecting the bid because of a perceived inadequacy in the amount tendered . . . .[R]ather than exercise the reserved authority to reject any or all bids, the State Director affirmatively accepted appellant's bid.  By doing so, contractual obligations arose binding both appellant and the Department.").

Subsequently, however, BLM notified the appellant that BLM "discovered that the tract [the appellant] had applied for was subject to prior existing mining claims." *Id.* BLM refused to "issue a patent to Dawson until the question of the validity of the claims was resolved." When the mining claims were finally resolved, "BLM advised [the appellant] that it could process his claim, but that, since the Small Tract Act of June 1, 1938, *supra*, had been repealed in 1976, its provisions no longer applied, and that he could therefore only purchase the parcel at current market value, which would be determined by a new appraisal." *Id.*

Implicitly rejecting the sort of argument the government makes in this case, the IBLA found that BLM's original communication "was an unequivocal offer to sell [the appellant] this tract and invited acceptance merely by submitting payment in this amount." *Id.* at 31. Further, the IBLA found that the appellant "did accept the offer by making payment of the demanded amount on March 14, 1956, at which point a binding contract to convey the property to appellant was created, subject only to any superior rights in the tract held by others." *Id.* Accordingly, the IBLA held that "[s]ince there was a binding contract to sell the tract to appellant for $275, BLM may not now increase the price of the tract." *Id.* According to the government in Silver State's case, BLM could have canceled the parties' contract without liability based, for example, upon the Agency's revised view of the fair market value (because the FLPMA only permits sales of land at fair market value and the "sale," argues the government, is ongoing until conveyance is completed). As the IBLA itself held, however, such a position is entirely inconsistent with the notion of a "binding contract" into which the government admits it entered with Silver State.[67]

---

[67] Similar to the agency's position in *Dawson*, the government here argues that the Secretary retained the contractual power to review and reverse any number of decisions that BLM officials made during the sale process, any one of which could have served – in the government's view – as a viable basis for not conveying the land patent to Silver State and avoiding liability for breach. *See* Tr. at 28:4-10 ("If the secretary in exercising the superintending authority over the sales of public lands determines there has been some defect in compliance with the regulations of the statute for determining fair market value, then, yes, the secretary would have the authority to terminate the sale, but to refund the money as well."). Under the government's interpretation, the Agency for all practical purposes is not bound by contract until it actually performs the contract by transferring the land patent, given the myriad factors the Secretary would be allowed to revisit prior to conveyance (notwithstanding the existence of an otherwise valid contract). *See, e.g.*, 43 U.S.C. §§ 1713(a)(1)-(3) (specifying various land disposal prerequisites); *id.* at § 1713(d) (sales of public land must be "at a price not less than their fair market value"); 1713(e) (for agriculture purposes, size of tracts sold cannot be "larger than necessary to support a family-sized farm").

D.C. Circuit precedent also supports the Court's conclusion here. In *Willcoxson v. United States*, 313 F.2d 884 (D.C. Cir. 1963), the Secretary of the Interior conducted a sale of public land pursuant to the Isolated Tracts Act and its implementing regulations. The then-applicable regulation, 43 C.F.R. § 250.5, provided that:

> until the issuance of a cash certificate, the authorized officer may at any time determine that the lands should not be sold, the applicant or any bidder has no contractual or other rights as against the United States, and no action taken will create any contractual or other obligation of the United States.

313 F.2d at 886.[68] The plaintiff bid on a tract of land and was declared the high bidder and "purchaser," but the Secretary's designee did not make timely delivery of the cash certificate to the plaintiff "because of a heavy backlog of work." *Id.* Subsequently, the agency became aware of the presence of valuable minerals on the land, the Secretary declined to convey the cash certificate, and, "inasmuch as cash certificates had not issued, [declared] the sales were 'null and void.'" *Id.* at 886-87. The plaintiff sued "to compel the Secretary to issue cash certificates." *Id.* at 887.

The D.C. Circuit held:

> [b]y providing that the authorized land officer may decide not to sell at any time prior to the issuance of a cash certificate, the regulation in effect denotes issuance of the certificate as acceptance of the applicant's proposal. . . . Until acceptance, no contract rights arose and no equitable title vested. . . . In the present case, since no rights in the tracts ever vested, the Manager was free to consider any facts discovered before the issuance of a cash certificate.

*Id.* at 888. Thus, the D.C. Circuit's decision concluded, by necessary implication, that *had* the Secretary issued the cash certificate, thereby formally accepting the bid and forming a contract, the Secretary would *not* have been free to consider new facts and cancel the sale.[69]

---

[68] A "cash certificate" is a "final certificate issued in connection with a cash entry." Bureau of Land Management, Department of Interior, *Glossaries of BLM Surveying and Mapping Terms* 9 (1980). A cash certificate is "evidenc[e] [of the] acceptance of an offer to purchase public land." *Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.*, 512 F.2d 706, 714 (9th Cir. 1975).

[69] Neither the parties, the district court, nor the D.C. Circuit addressed *Willcoxson* in *Silver State I* or *II*. The Court finds it difficult to square the *Silver State I* and *II* decisions with the D.C.

Returning to § 1713(f), that statutory provision, at best, is akin to a FAR provision governing an agency's selection of a particular contracting method, but that does not yield any contractual rights or obligations in a resulting contract (even if the provision had been incorporated verbatim).  For example, where the government exercises its discretion to engage in a sole-source procurement (*see, e.g.*, FAR 6.302-1), and then awards a contract without competition, the government cannot later reconsider its written justification for the sole-source award and unilaterally terminate the procurement without paying damages.  Indeed, "[t]he fact that a contract may be inconsistent with a statutory or regulatory requirement does not *ipso facto* render the contract void."  *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1372 (Fed. Cir. 2018).[70]  The government does not contend that the parties' contract here was void *ab initio*, *see* Tr. at 39:22-24, but rather effectively argues that "another procedure would have been preferable or better attuned to the aims of the competitive bidding legislation."  *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963) ("If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit.").  Here, the government concedes the parties' contract was valid when formed, resulting from a sales process that was lawful when conducted, and nothing in § 1713(f) permits the Agency to undo its selected method of sale.

5.     **No Other Contract Terms Permit the Government to Avoid Its Contractual Obligation to Silver State**

Although the government concedes that its motion to dismiss hinges on the incorporation of 43 U.S.C. § 1713(f) in the contract at issue – an interpretation this Court

---

Circuit's decision in *Willcoxson*.  If the Secretary's designee is always free to revisit a decision and consider new facts before issuing a patent (as *Silver State I* and *II* hold), why did the D.C. Circuit hold in *Willcoxson* that "since no rights in the tracts ever vested, the Manager [the Secretary's designee] was free to consider any facts discovered ***before the issuance of a cash certificate***"?  313 F.2d at 888 (emphasis added).  The necessary implication of *Willcoxson* appears to be that a proper, legal acceptance – as occurred in this case – *would have* resulted in vested contract rights that Interior could *not* revisit even prior to formally transferring the property.

[70] To the contrary, "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States."  *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999) (en banc).  The Court rejects the notion that 43 U.S.C. § 1713(f) was somehow contravened – or that it could be contravened once Silver State tendered the total bid price for the Property – but the government remains free to engage in discovery regarding whether Silver State's representations to the Agency may provide grounds for the government to argue that the contract should be held invalid or voided.  *See infra*, Section VI.

rejected above – the government at times contends that its power to terminate the transaction without liability depends upon the application of yet other statutory provisions, namely 43 U.S.C. § 1457 and 43 U.S.C § 2.  *See* Def. Mot. at 30 ("The Secretary (acting through the Assistant Secretary) relied on [43 U.S.C. § 1457] to order the cancellation of the unlawful sale to Silver State."); Def. Reply at 21 ("Finally, it is not 'absurd' for the Secretary 'to continuously monitor' whether a sale of Federal public land satisfies the requirements of FLPMA, including 'after [an] auction sale has concluded.'  Congress has 'charged the Secretary with precisely that responsibility. 43 U.S.C. § 1457"); Appx. A192; Tr. at 37:1 - 38:5 ("Section 2 and Section 1457 of Title 43, which not only authorize, but charge the secretary with the final superintending authority to ensure that all sales of public lands are in compliance with the laws.").

Those other statutory provisions – whether considered independently or collectively – do not yield the government a *contractual* right to revisit the decision to utilize modified competitive bidding procedures to solicit offers, particularly not after accepting Silver State's bid and its payment of the total bid price, because the parties' contract does not incorporate any of those additional provisions.  There is simply no contractual document that contains even a bare reference to 43 U.S.C. § 1457 or 43 U.S.C. § 2.  *See generally* Appx. A73-76, A84-101, A106-08, A162-64, A183-85. Consequently, the contract, with respect to 43 U.S.C. § 1457 and 43 U.S.C § 2, does not meet our Circuit's standard for incorporation by reference, as explained above.  *See Northrop Grumman Info. Tech., Inc.*, 535 F.3d at 1345 (the "reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract").  To the extent the government argues that the contract incorporates those statutes by reference to the FLPMA or some other act of Congress, the Court finds that position contrary to the rationale underlying the binding precedent in this Circuit. *See St. Christopher Assocs.*, 511 F.3d at 1384 (disfavoring "wholesale incorporation of regulations into a contract" and the creation of '[a] wholly new ground of obligation . . . by mere implication.'" (quoting *Smithson*, 847 F.2d at 794)).

Second, whatever authority those additional statutory provisions confer on the Agency, generally, none of them can be transmogrified into contractual rights or into extra-contractual powers permitting the government to avoid liability here for breach of contract.  While the Court does not question the preclusive effect of the decision in Silver State's APA litigation regarding the Secretary's plenary power not to convey the land patent to Silver State,[71] the Court holds, as a matter of contract interpretation, that had the parties' contract incorporated the statutory provisions at issue as contract terms

---

[71] *See infra*, Section IV.

(which the contract did not), such terms would *not* provide the Agency with the power to avoid liability for the alleged breach.  For example, 43 U.S.C. § 2 provides:

> The Secretary of the Interior or such officer as he may designate shall perform all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government.

As discussed above, the Secretary's designated officer already performed the executive duty "appertaining to the . . . sale of . . . public land" that 43 U.S.C. § 1713(f) prescribes when BLM determined, at the latest in the NORA, that the Agency would employ modified competitive bidding procedures.  Nothing in the plain language of 43 U.S.C. § 2, even when combined with 43 U.S.C. § 1713(f), gives the Secretary's designated officer the ability to revisit that determination after contract formation, make a new discretionary determination that modified competitive bidding retroactively was not appropriate in light of events that transpired after contract formation, and then refuse to perform under a binding contract while avoiding liability for its breach.

Nor does the plain language of 43 U.S.C. § 1457 aid the government here.  That statute provides as follows:

> The Secretary of the Interior is charged with the supervision of public business relating to the following subjects and agencies:

>> 1. Alaska Railroad.

>> 2. Alaska Road Commission.

>> 3. Bounty-lands.

>> 4. Bureau of Land Management.

>> 5. United States Bureau of Mines.

>> 6. Bureau of Reclamation.

>> 7. Division of Territories and Island Possessions.

>> 8. Fish and Wildlife Service.

9. United States Geological Survey.

10. Indians.

11. National Park Service.

12. Petroleum conservation.

13. Public lands, including mines.

This statute cannot reasonably be read as granting the Secretary's designated officer the reservation of *contract* powers the government asserts (*i.e.*, to effectively void a binding contract at the government's option without liability). *See C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof."). Indeed, the government does not cite to a single case in which any court has held that 43 U.S.C. §§ 2 or 1457 grant the Secretary the power to avoid performance of a valid contract while avoiding liability for breach, and, as discussed above, the IBLA implicitly has rejected this argument. *See Chester F. Dawson*, 73 IBLA 27 (May 9, 1983). The Court recognizes the preclusive effect of the prior APA litigation, but that holding does not mean that, as a matter of *contract* law, the Secretary has the power to avoid liability for breach of contract; it only means that Silver State was not entitled to injunctive relief *under the statute and the APA.*[72]

The government does not argue that it may avoid liability for breach because the parties' contract incorporated the Secretary's power under 43 C.F.R. § 4.5. The Assistant Secretary, however, took "jurisdiction over this matter, pursuant to the authority reflected in 43 C.F.R. § 4.5(a)" and rendered a "final decision" directing BLM not to convey the land patent to Silver State. Appx. A195. Accordingly, it appears that the government's argument should also hinge, at least in part, on the contract's having

---

[72] Neither the district court nor this Court has the power to order specific performance of a government contract. *Stewart v. Mabus*, 2016 WL 753939, at *7 (D.D.C. Feb. 24, 2019) ("'[T]he Tucker Act and Little Tucker Act' provide the exclusive remedies for any alleged breach of contract by the federal government and thereby 'impliedly forbid' the federal courts' jurisdiction to grant declaratory relief or specific performance in contract cases." (quoting *Sharp v. Weinberger*, 798 F.2d 1521, 1253 (D.C. Cir. 1986)); *see Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007) ("Since the Tucker Act grants consent for suits based on contract, this has been interpreted by . . . other courts to preclude under the APA contract claims of any kind, either for damages or specific performance"); *see also, infra*, Section IV.

incorporated *that* power.  Nevertheless, the government cannot rely upon 43 C.F.R. § 4.5 to avoid liability for breach for at least three reasons.

First, none of the contract documents contain even a bare reference to 43 C.F.R. § 4.5.

Second, even if the parties' contract had incorporated 43 C.F.R. § 4.5 as a contract term, the Court is unsure whether, as a matter of contract interpretation, 43 C.F.R. § 4.5 would authorize the Assistant Secretary to "assume jurisdiction" over the matter here and permit the Agency not to convey the land patent.  In that regard, the regulation — located within 43 C.F.R. Part 4, Department Hearings and Appeals Procedures, Subpart A, General; Office of Hearings and Appeals — provides that the Secretary may assume "jurisdiction at any stage of any case before any employee or employees of the Department," 43 C.F.R. § 4.5(a)(1), or "review any decision of any employee or employees of the Department."  43 C.F.R. § 4.5(a)(2).  In context, the regulation appears to provide the Secretary with the specified authority only when a party has filed an administrative appeal, and, indeed, the Court located only one case in which BLM invoked the power under 43 C.F.R. § 4.5(a) when there was no pending administrative appeal.  In that case, however, the United States District Court for the District of South Dakota questioned the Secretary's authority to assume jurisdiction to review the decision at issue in the absence of an administrative appeal, although the court ultimately decided the question on other grounds.  *See Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1200–01 (D.S.D. 2000), *vacated sub nom. on other grounds Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031 (8th Cir. 2002).

Third, even if the parties' contract had included 43 C.F.R. § 4.5 and even if that regulatory provision were read to reserve to the Assistant Secretary the authority to order BLM not to convey the land, BLM may have breached *its* contractual duty under *that* regulation.  Specifically, 43 C.F.R. § 4.5(c) provides as follows:

> If the Secretary or Director assumes jurisdiction of a case or reviews a decision, *the parties* and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.

The Assistant Secretary, after assuming jurisdiction over the matter pursuant to 43 C.F.R. § 4.5(a), apparently never notified Silver State of BLM's Recommendation Memorandum, nor does the record before this Court reflect that the Assistant Secretary requested and reviewed the administrative record prior to issuing a written decision

adopting BLM's recommendation.  *See Rosebud Sioux Tribe*, 104 F. Supp. 2d at 1200-01 ("Assuming that . . . the Assistant Secretary did have authority to assume jurisdiction over the matter or to review the decisions of the local BIA officials [he] would have been bound to follow the requirements of the regulation in exercising any inherent authority, [and] he clearly did not adhere to the procedures outlined in § 4.5(c).").

*   *   *   *

At base, the government's motion to dismiss turns upon whether the parties' contract contained terms reserving the government's right to:  (1) reverse its determination, made prior to the NORA's issuance, that a modified competitive sale was proper and lawful;  (2) undo its acceptance of Silver State's bid;  (3) delete unilaterally the parties' contractual finding in the escrow agreement that the completed sale was lawful and proper;  and (4) terminate the contract at issue notwithstanding that Silver State tendered timely final payment consistent with the NORA, BLM's Acceptance Letter, and the bilateral escrow instructions.  The Court holds that the parties' contract contains no such reservation of rights in favor of the government, and the government's meld of the various statutory and regulatory provisions upon which it relies cannot yield contract rights *ex nihilo.*

To be clear, the question in this case is *not* whether the government has an ongoing statutory or regulatory duty to follow the law or even to ensure that its contractual processes, resulting in land sale contracts, are lawful.  This Court decides neither the scope of the Agency's plenary power over federal lands prior to their conveyance, nor the Agency's statutory power to decline to convey land pursuant to governing statutes and regulations.[73]  Rather, this decision holds only that once the government sold the Property pursuant to the NORA's process, and thus entered into a contract with Silver State – here, at the latest, when Silver State tendered its full bid price pursuant to the agreed-upon escrow instructions – the government could not renege on its contractual duty to convey the Property without facing the prospect of having to pay damages for breach of that contract.[74]

---

[73] *See, e.g., Mack Brothers v. Maine State Housing Authority,* 2011 WL 2633084, *7-8 (D. Maine 2011) (explaining that "[a]s alleged, federal law does not call for the rejection of HUD's administrative action, preexisting contract language does," and therefore contract claim should be pursued in Court of Federal Claims).

[74] Consistent with the NORA, BLM could have:  (1) rescinded the NORA before receipt of bids; or (2) rejected all offers or withdrawn the land from sale within 30 days of receipt of offers.  The relevant statutory and regulatory provisions provided the Agency with such power, the Agency reserved its right in the NORA to take those actions, but the Agency declined to do so.

## IV.    This Court Rejects the Application of Issue Preclusion to Silver State's Contract Claim

Cataloging numerous excerpts from *Silver State I* and *Silver State II*, the government contends that Silver State's instant suit before this Court is barred by issue preclusion, also known as collateral estoppel.[75]  Def. Mot. at 32-43.  In evaluating the government's issue preclusion argument, we once again are guided by the Federal Circuit, which has held that "[c]ollateral estoppel is appropriate only if:  (1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action."[76]  *Arkla, Inc. v. United States*, 37 F.3d 621, 624 (Fed. Cir. 1994) (citing *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed. Cir. 1983)).  Issue preclusion does not bar Silver State's claim here because each of these four conditions is not satisfied.  The burden is on the party seeking preclusion to show "that the same issue was 'actually and necessarily determined' in the prior proceeding." *Connors v. Tanoma Min. Co., Inc.*, 953 F.2d 682, 684 (D.C. Cir. 1992); *see also Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (noting that "claim preclusion, like issue preclusion, is an affirmative defense" that the defendant must "plead and prove" and citing 18 Wright & Miller § 4405, at 83 for the proposition that a "party asserting preclusion must carry the burden of establishing all necessary elements").

### A.    *Silver State I*

The focus of the litigation before the district court was Silver State's request "to order the BLM to issue the patent to the plaintiff, as well as to enjoin the BLM from

---

[75] "Although the term res judicata was once used primarily to denote the concept of claim preclusion, usage of the term res judicata has evolved to include 'any preclusion of litigation arising from a judgment, including collateral estoppel.'" *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 n.2 (Fed. Cir. 2008) (quoting *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed. Cir. 1991)); *see also Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1323 (Fed. Cir. 2008) ("This case involves the doctrine of res judicata, which includes the two related concepts of claim preclusion and issue preclusion.").

[76] The government asserts that this Court should ascribe preclusive effect to numerous statements in both the district court and the D.C. Circuit decisions in, respectively, *Silver State I* and *II*.  Neither party addresses whether it is appropriate for the Court to accord preclusive effect to certain issues addressed in the district court decision given that the D.C. Circuit reviewed the entire case *de novo*.  Despite the Court's concerns that certain issues in the district court decision were not "essential to [the] final judgment" in the D.C. Circuit's opinion, the Court, nevertheless, has considered all of the issue preclusion arguments in the government's motion and finds none persuasive.

reoffering the Property for sale." *Silver State I*, 145 F. Supp. 3d at 123. The government acknowledged that Silver State's claims were not contract-based, but rather were "brought under the Administrative Procedure Act ('APA'), 5 U.S.C. § 701, *et seq.*, and [were] subject to the 'highly deferential' standard of review set out in the APA." Def. Opp. in *Silver State I* at 6, 2014 WL 12691273. Consistent with such a cause of action, the district court limited itself to reviewing the administrative record and applied a "'highly deferential'" standard of review, as urged by the government. *Silver State I*, 145 F. Supp. 3d at 123-24 (citing *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015)).

More significantly, in distinguishing the plaintiff's APA action from a breach of contract action, the Agency conceded that, "prior to the transfer of title, contractual rights may attach at different phases of the transaction[.]" Def. Opp. in *Silver State I* at 11, 2014 WL 12691273. Indeed, with regard to the 30-day decisional period specified in § 1713(g), the government itself argued that the provision, while not precluding the Secretary from refusing to convey the Property, served to establish "a window of time within which the Secretary (or her designee) can terminate a land sale without repercussions such as financial liability to the potential purchaser." Defendants' Cross-Motion for Summary Judgment in *Silver State I* at 13, 2014 WL 12691272 [hereinafter "Def. Cross Mot. in *Silver State I*"].[77] Equally significant was the government's concomitant (and correct) representation that "a breach of contract claim is not justiciable in [the district] court." *Id.* at 13 n.8, 2014 WL 12691272 (citing *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 (D.C. Cir. 1985), and *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 964 (D.C. Cir. 1982)).

The district court adopted the government's argument – apparently the opposite of what it argues before this Court – holding that "the agency is correct that ***the plain language of the statute does <u>not</u> address the Secretary's authority to terminate the sale***, where the agency has already accepted the offer within 30 days," even assuming, as the Agency determined, that the land transfer would be contrary to law. *Silver State I*, 145 F. Supp. 3d at 129 (emphasis added).[78] While Silver State had asked the district court

---

[77] *See also* Defendants' Reply in Support of Cross-Motion for Summary Judgment in *Silver State I* at 5, 2014 WL 12691276 [hereinafter "Def. Reply in *Silver State I*"] ("As explained in the Federal Defendants' opening brief, Section 203(g) of FLPMA merely sets a window of time within which the Secretary (or her designee) may terminate a land sale without repercussions such as financial or contractual liability to the potential purchaser."). That is essentially Silver State's position in the instant case.

[78] *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." (citations omitted)). The possibility that judicial estoppel might apply here *against the*

"to construe § 1713(g) as limiting the Secretary's authority to refuse an offer to purchase to the time period within thirty days after receipt of such offer" – because otherwise the clause "no later than thirty days" would be rendered "superfluous" – the district court disagreed. *Id.* at 130. But, we must be precise regarding *what* the district court held, which was only that the FLPMA did not constrain the Secretary's *plenary* power to refuse to transfer the Property.[79] *Id.* at 125; *see Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 666 (D.C. Cir. 2006) ("This case, like every judicial decision, cannot be divorced from its facts.. . . . [O]ur *ratio decidendi* necessarily depends on the context in which the statement was made."); *Klamath Irr. Dist. v. United States*, 64 Fed. Cl. 328, 332–33 (2005) (Allegra, J.) (explaining that a court's decisional language must be "read in context" and in light of "the *ratio decidendi* of the . . . opinion").

Significantly, the district court *did* agree that a bidder may, under § 1713(g) "bring an action to compel the agency to comply with the statutory time limit and, further, *upon acceptance of an offer, the agency acknowledged the possibility of 'repercussions such as financial liability to the potential purchaser.'"* *Silver State I*, 145 F. Supp. 3d at 131 (quoting Def. Mot. for Sum. Judgment in *Silver State I*) (emphasis added). Thus, according to the district court, "the time limits are not superfluous." *Id.* This district court conclusion, in that regard, lines up well with this Court's *contract* interpretation, and, if anything, suggests that Silver State's Complaint for breach of contract should proceed, and not be dismissed by this Court.

---

*government* – in terms of Silver State's contract claim – suggests that collateral estoppel should not apply to bar that claim.

[79] *See Nebraska Public Power Dist. V. United States*, 590 F.3d 1357, 1372 (Fed. Cir. 2010) ("In assessing whether the D.C. Circuit's mandamus order improperly invaded the jurisdiction of the Court of Federal Claims over the adjudication of contract rights, it is important to focus on precisely what agency action was challenged in the D.C. Circuit and what relief the D.C. Circuit granted."). In *Nebraska Public Power*, the Federal Circuit held that the Court of Federal Claims erred in declining to afford preclusive effect to the D.C. Circuit's prior mandamus order. In that case, however, the D.C. Circuit concluded that "'[t]he statutory duty . . . [was] independent of any rights under the contract'" and specifically "disclaimed that its authority otherwise extended to any issue of contract interpretation, enforcement, or remedies." *Id.* at 1373 (quoting *N. States Power Co. v. Dep't of Energy*, 1998 WL 276581 at *2 (D.C. Cir. May 5, 1998)). This Court recognizes the preclusive effect of the D.C. Circuit's decision with respect to Silver State's APA claim, but concludes that the Secretary's plenary power regarding final land title transfer – pursuant to a number of statutes, as described in *Cameron v. United States*, 252 U.S. 450, 459-60 (1920) – cannot be invoked to avoid a contractual duty. *See Silver State II*, 843 F.3d at 990 (discussing *Cameron* and concluding that BLM had the statutory power not to provide the land patent to Silver State).

As to 43 C.F.R. § 2711.3-1(g), the district court concluded that "[t]o the extent this regulation may confer any contractual right upon an offeror whose offer has been accepted, the regulation is silent as to what those rights may be." *Id.* at 131 n.14. The district court thus did not reach the question of the parties' contractual rights. Once again, the district court only held that Silver State could not "compel the agency to deliver the patent." *Id.* at 131.

In general, the district court's approach to the FLPMA – in siding with the government in *that* case – undermines the government's position in *this* case. For example, the district court found "that the Secretary's power to stop consummation of a sale by refusing to issue a patent when consummation would be unlawful *does not come within the ambit of any section of the FLPMA*." *Id.* at 133 n.16. Putting aside whether this Court agrees with the district court's usage of the term "consummation," what *is* clear is that the government was forced to rely upon other provisions of law – including 43 U.S.C. § 2 and 43 C.F.R. § 4.5 – to withstand plaintiff's APA challenge. *Id.* But, as the government acknowledged before this Court – both in the briefs and at oral argument[80] – the government's motion to dismiss here turns on whether § 1713(f), an FLPMA provision, is incorporated in the contract and may be interpreted to excuse the Agency's refusal to meet its contractual obligations. The parties never litigated that issue in the APA litigation, and thus the district court never decided whether the parties' contract incorporated § 1713(f). At a minimum, and consistent with the Court's analysis above, the plain language of the FLPMA does *not* support the government's contract interpretation and certainly not without the aid of other provisions that are found nowhere in any document that, *according to the government*, comprise the parties' contract.[81]

In sum, even accepting the district court's conclusion that Silver State lacked "the specific right to compel the agency to issue a land patent," *Silver State I*, 145 F. Supp. 3d at 139, that determination pursuant to the APA does not foreclose – and is arguably orthogonal to – plaintiff's *contract* claim. *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 174 (2014) (holding that a decision reviewed under the APA cannot preclude a subsequent contract claim, that "there is no inconsistency between Griffin's breach of contract claim and the IBLA's decision here[,]" and that "fidelity to the IBLA's

---

[80] Def. Mot. at 47; Tr. at 37:12-15 ("THE COURT: So the government – does the government's case here in terms of no breach hang on 1713(f) alone, or no? MR. ROSENBERG: Yes. It does depend on 1713(f)."); *see, supra,* 28.

[81] Unlike the Department of Energy Standard Contract at issue in *Nebraska Public Power*, *see supra* n.79, here there is no statute or court order "directing the inclusion" of a particular clause in the parties' contract, an issue upon which the district court and the D.C. Circuit in *Silver State I and II*, in any event, declined to opine. 590 F.3d at 1375.

determination that BLM never conveyed a valid leasehold interest to plaintiffs does not preclude this Court from concluding that the lease itself (in which BLM promised to convey such an interest) was a valid contract for purposes of plaintiffs' contract claim").

**B.**     *Silver State II*

Before the D.C. Circuit, in Silver State's appeal of the APA action, the government repeated the same concessions from the district court proceedings recounted above, similarly disclaiming that Silver State's APA claims involved contract issues:

> By its plain terms, Section 1713(g) creates a thirty-day window within which the Secretary (or her designee) may decide to reject an offer or withdraw the land from sale *without incurring financial repercussions*. After the Secretary has accepted an offer and the thirty-day window has expired, *the bidder may have contractual rights against the United States*.

Brief of Federal Appellees in *Silver State II* at 39-40, 2016 WL 3440116 [hereinafter "App. Br. in *Silver State II*"] (emphasis added). Indeed, the very point of that concession was that "[t]hose [contractual] rights do not affect the Secretary's broad authority to terminate the sale" – that is, to refuse to convey the Property via land patent. *Id.* And, once again, the government allowed that "Silver State may have a contractual claim against the United States based on the assertion that the Secretary had accepted its offer," and correctly noted "that [such a] claim does not belong in this Court." *Id.* at 40 (citing *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893-94 (D.C. Cir. 1985)).

Those concessions simply cannot be squared with the government's position in this contract litigation.

While affirming the district court's decision, after applying a *de novo* standard of review, the D.C. Circuit similarly declined to decide any contract issues. *Silver State II*, 843 F.3d at 992 (quoting 145 F. Supp. 3d at 131 n.14). Nor could the D.C. Circuit have decided any of the contract issues, even assuming they had been litigated, which they were not. *Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 261 (D.D.C. 2011) ("The APA's waiver of sovereign immunity may not be used 'to circumvent the jurisdictional and remedial limitations of the Tucker Act.'" (quoting *Spectrum Leasing*, 764 F.2d at 893)).

**C.      The Prior APA Litigation Does Not Require Dismissal of Silver State's Contract Claim**

First, this Court need only reach the government's issue preclusion argument if the Court holds that the parties' contract incorporated, at a minimum, 43 U.S.C. § 1713. As demonstrated *supra*, however, the parties' contract did not incorporate that statute. Nor does the contract at issue incorporate § 1713(f), or any of the other statutory or regulatory provisions – *e.g.*, 43 U.S.C. §§ 2 or 1457, or 43 C.F.R. § 4.5 – upon which the Agency relied both initially in rendering its decision to decline to transfer the Property and, subsequently, in defense of that decision during the APA litigation.  Accordingly, the government's issue preclusion defense fails.

Second, even if the parties' contract were interpreted to incorporate 43 U.S.C. § 1713(f), neither *Silver State I* nor *Silver State II* precludes Silver State's breach of contract claim.  As explained in more detail below, this Court must analyze the issue(s) to be decided in this case, and compare them to the issue(s) litigated and decided in the APA matter.  Those issues must be identical, and they are not.

As this decision repeatedly has noted, the issue to be decided in this action is not simply whether the Agency could refuse to convey the land patent, but whether the parties' contract permitted the Agency to do so without liability for breach of contract. The APA litigation, however, established only that the Secretary had the plenary power to decline to transfer the land patent to Silver State, but neither the district court nor the D.C. Circuit ever opined on the breach of contract; if anything, as detailed above, both courts explicitly reserved the contract question for this Court to decide.  Nothing in the plain language of the statutes at issue – even assuming the parties' contract somehow incorporated them – permits the government not to perform the contract while avoiding liability for breach.  *See* Tr. at 94:1-6 (conceding that the D.C. Circuit did not "directly" address the meaning of the word "sale" in Section 1713(f)).

The government further contends that issue preclusion forecloses this Court from revisiting the D.C. Circuit's determination that the FLPMA does not constrain the Secretary's plenary authority to cancel an illegal land sale.  But, because the D.C. Circuit did not reach the contract issue, this Court reads the D.C. Circuit's decision as holding only that the FLPMA does not constrain the Secretary's plenary power to decline to convey land.  That holding does not speak to whether BLM breached its contract with Silver State for exercising such extra-contractual (statutory) plenary power.

Although the government asserts that Silver State may not relitigate whether the MPA was the sole basis for the Agency's deciding to engage in a modified competitive sale, that issue is a red-herring in terms of the contract issue.  Even if the MPA were the

reason for BLM's deciding to employ certain sales procedures, the MPA was not the sole basis for the resultant contract.  Indeed, the contract does not incorporate the MPA and contains no term that conditions BLM's performance on the continued existence of the MPA.  BLM may have wished that the MPA had still been in place or may have decided not to engage in the modified competitive sale if the MPA had not been in place when BLM made that determination.  The bottom line, however, is that the Agency contracted with Silver State to transfer the Property without the condition that the MPA be in place – and agreed to a deadline to do so – by the time the Agency determined that it would refuse to meet its obligation.

The government also argues that Silver State is collaterally estopped from challenging the D.C. Circuit's decision affirming that the Agency's decision to terminate the sale – *i.e.*, to refuse to transfer the land patent – was rational, supported by substantial evidence, and not arbitrary or capricious.  But, that conclusion represents the answer to what is strictly an APA question, and has no bearing on the terms of the parties' contract or Silver State's breach claim.

Accordingly, the government cannot satisfy its burden to establish the elements of collateral estoppel.  At a minimum, given (1) the government's representation before the district court and D.C. Circuit regarding their lack of jurisdiction over any contract claims, and (2) the government's conceding – and the district court's finding – the "possibility of 'repercussions such as financial liability to the potential purchaser'" pursuant to § 1713(g), we decline to apply issue preclusion to bar any part of Silver State's contract claim here.  In so deciding, the Court finds persuasive the reasoning of the Federal Circuit's (unpublished) decision in *Charter Fed. Sav. Bank v. United States*, 87 F. App'x 175 (Fed. Cir. 2004).  In that case, the Federal Circuit declined to apply issue preclusion where a previous decision rendered by the United States Court of Appeals for the Fourth Circuit "deliberately avoided the issue of contract formation." 87 F. App'x at 177.  Because the Fourth Circuit "never reached the issue" of the government's alleged contractual promises and where, in any event, "the Fourth Circuit did not have jurisdiction to decide, and thus did not decide" the plaintiff's contract claims, the Federal Circuit refused to accord the Fourth Circuit's decision preclusive effect.  *Id.; see also Cook v. United States*, 85 Fed. Cl. 820, 824 n.4 (2009) (refusing "to adopt the government's position that the district court's decision in [an APA action] bars plaintiffs' claims in this action" due to issue preclusion), *aff'd*, 368 F. App'x 143 (Fed. Cir. 2010).

Moreover, the Federal Circuit has explained that "[p]recedent cautions that res judicata is not readily extended to claims that were not before the court, and precedent weighs heavily against denying litigants a day in court unless there is a clear and persuasive basis for that denial."  *Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1557 (Fed.

Cir. 1996) (addressing issue preclusion and holding that "[i]n the case at bar it is not possible to show that the identical issue was presented"). As a related matter, "[t]he requirement that the issue be necessary to the judgment is interpreted narrowly." *Armour of Am. v. United States*, 73 Fed. Cl. 597, 601 (2006) (citing Restatement (Second) of Judgments § 27 cmt. h (1982), and *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326–27 (4th Cir. 2004)).

In this case, the procedural history and record are clear that the issues of contract formation and interpretation – not to mention contract remedies – were not "identical" to the issues decided in Silver State's APA action, were not "actually litigated" in the APA action, and were not essential to a final judgment in the APA action.[82] Particularly as a result of the jurisdictional issue, the parties could not possibly have had a full and fair opportunity to litigate the contract issues in the APA action. *See Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C. Cir. 1982) ("'a court's lack of jurisdiction to decide an issue directly may affect the collateral estoppel effect of the particular factual determination'" (quoting *De Magno v. United States*, 636 F.2d 714, 724 (D.C. Cir. 1980))). Indeed, "any . . . ambiguity" – in terms of what issues were decided in the earlier APA case – "should be resolved in [plaintiff's] favor." *Charter Federal*, 87 Fed. App'x at 178.

Moreover, the standard of review applicable to the review of agency actions or decisions in the district court and circuit court is highly deferential, whereas "the Federal Circuit has held that deference is inappropriate in the context of a contract dispute in which the agency has a financial interest." *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 661 (2003) (citing cases). That is a critical distinction between an APA case and a contract case. In the latter, where there is a conflict between an agency's interpretation and the contract terms, "[i]t is the unambiguous terms of the contract, not the unilateral beliefs of one of the parties, that define the parties' respective obligations." *Park Village Apartments v. United States*, 25 Cl. Ct. 729, 733 (1992) (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934) (internal quotation omitted)). The differing standards of review all but preclude the application of collateral estoppel here. *Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1021 n.3 (Fed. Cir. 2018) (noting that the Federal Circuit's earlier decision "has no preclusive effect because the . . . issue there . . . involved a different burden of proof and different standard of review than the issue presented in this case"); *Otero v. Unum Life Ins. Co. of Am.*, 226 F. Supp. 3d

---

[82] *See Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538–39 (Fed. Cir. 1995) (holding that a finding was not essential to a judgment for collateral estoppel purposes where judgment was supportable on other grounds); Restatement (Second) of Judgments § 27, cmt. i (favoring the stricter rule that, when a judgment may have been based on alternative grounds, any of which would be sufficient to support the result, the judgment is not preclusive with respect to any ground standing alone).

1242, 1267 (N.D. Ala. 2017) (rejecting application of collateral estoppel where the "court's review in the instant case . . . is a *de novo* review and is not limited to the administrative record" and "given the different standard of review, different administrative record, and different claim").[83]

    Finally, to the extent the D.C. Circuit wrote that the Secretary was not required to follow the timeline prescribed by 43 U.S.C. 1713(g) – or the implementing regulation at 43 C.F.R. § 2711.3–1(f) – the Court declines to accord this statement preclusive effect.  In that regard, the parties' arguments and the D.C. Circuit's decision appear to have focused on whether the Agency timely "withdrew" the Property from sale.  *See Silver State II*, 843 F.3d at 993 ("Appellant's third argument, that the Secretary failed to comply with 43 C.F.R. § 2711.3-1(f), is incorrect. . . .  It is irrelevant whether the Secretary 'failed to address any of the three limited bases for withdrawing a sale in 43 C.F.R. § 2711.3-1(f)(1)-(3),' . . . because that regulation is inapposite here, as the Secretary did not withdraw the land from sale." (citations omitted)); Final Brief for Appellant Silver State Land, LLC in *Silver State II* at 25, 2016 WL 4036397 ("The Secretary's decision failed to address any of the three limited bases for withdrawing a sale in 43 C.F.R. § 2711.3-1(f)(1)-(3).").  This Court concurs that the Agency did *not* withdraw the Property from sale, *Silver State II*, 843 F.3d at 991, but respectfully disagrees with the D.C. Circuit's conclusion – as a matter of contract law – to the extent that court explained that 43 C.F.R. § 2711.3–1(f) "only specifies the circumstances under which the Secretary 'may *withdraw* any tract from sale.'"  *Id.* at 993 (quoting 43 C.F.R. § 2711.3–1(f)) (emphasis in original).  That regulation covers not only *withdrawal*, but also BLM's "refus[al] to accept any offer" where the Agency "determines that . . . [c]onsummation of the sale would be inconsistent with the provisions of any existing law."  43 C.F.R. § 2711.3–1(f).  That determination must be made within the statutory 30-day period and appears to cover the very determination the Agency made here, as the Court explained, *supra*, in Section III.B.3. of this decision.  The Agency, however, acted to cancel its contract with Silver State well after the 30-day period had passed.  Thus, the Agency effectively refused "to accept any offer" after determining that "[c]onsummation of the sale would be inconsistent with the provisions of any existing law" but the Agency did so – as a matter of contract law – *after* the sale had been completed and *after* the prescribed 30-day window.  Given that it is far from clear whether the parties actually litigated that particular question, and that the D.C. Circuit does not seem to have addressed it, the doctrine of collateral estoppel should not apply.  *See Kearns*, 94 F.3d at 1557 ("precedent weighs heavily against denying litigants a day in court unless there is a clear and

---

[83] Silver State's claim in this Court is one under the Tucker Act for money damages due to breach of contract, which is entirely different than the claim for equitable relief that Silver State brought in the district court challenging agency action on the administrative record.

persuasive basis for that denial"); *Charter Fed. Sav. Bank*, 87 F. App'x at 178 ("to the extent it may be ambiguous what issues were actually decided by the Fourth Circuit, any such ambiguity should be resolved in . . . favor" of the party not asserting issue preclusion).

In sum, the Court holds that the government has not met its burden to justify the application of collateral estoppel in this case.  As explained earlier in this decision, the question currently before this Court is whether Silver State has stated a claim for breach of contract which would entitle Silver State to money damages, in contrast to the APA case which centered on whether Silver State could compel the Agency to transfer the land patent at issue.  The district court and the D.C. Circuit both held that the FLPMA does not constrain the Secretary's plenary power to refuse to convey the land patent and that the Secretary's exercise of that power was not arbitrary or capricious.  This Court holds that the parties' contract did not incorporate the Secretary's plenary power or any other statute or regulation on which the Agency relies, and, to the extent the parties' contract incorporated 43 U.S.C. § 1713(f), that contract term did not permit BLM to refuse to convey the land patent while avoiding liability for breach of contract.

To the extent this Court's decision is inconsistent with, or otherwise disagrees with, either the district court or the D.C. Circuit's interpretation of the relevant statutory and regulatory provisions, we reemphasize that our focus is only on the *contractual* rights and obligations of the parties – taking into account all of the documents that comprise the parties' agreement – interpreted without deference to the Agency. *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1333 (Fed. Cir. 2004) (rejecting preclusive effect of prior Fifth Circuit decision, and holding that decision "void as to the contract issues that could have been decided and also as to those contract issues actually decided").[84]

## V.     This Court Denies The Government's Motion To Dismiss Plaintiff's Claim For Consequential Or Expectancy Damages

The government additionally contends that the Court should dismiss Silver State's Complaint because "Silver State seeks damages that . . . it cannot recover as a matter of law."  Def. Mot. at 56.  The government raises two principal arguments:

---

[84] Indeed, in *Christoper Village*, the Federal Circuit specifically concluded that while "[t]he Court of Federal Claims correctly declined to afford res judicata effect to the Fifth Circuit's decision, . . . it erred in ascribing collateral estoppel effect to the contract issues decided by the Fifth Circuit.  Those issues should have been decided de novo by the Court of Federal Claims."  *Id.; see also Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (distinguishing, for jurisdictional purposes, between contract rights and statutory rights that "exist independent of the . . . Contract").

(1) Silver State's demand for "lost profits" are "per se unrecoverable" because they are too "speculative and remote"; and (2) Silver State's "claim for reliance damages incurred before November 28, 2012" are unrecoverable because they are based on an implied-in-law contract. *Id.* at 56-58. The court denies the government's motion to dismiss on these grounds because Silver State's Complaint adequately alleges "damages caused by the breach." *San Carlos Irr. & Drainage Dist.*, 877 F.2d at 959.

Silver State's Complaint alleges that "[a]s a direct result of [the BLM's] breach, Silver State has suffered damages in excess of $98,000,000," including "the difference between Silver State's contract price and the fair market value of the land" in addition to "other losses incurred by Silver State." Compl. ¶ 46. To calculate these damages, Silver State relies on "a Letter of Intent from D.R. Horton, Inc. ("Horton"), expressing Horton's interest in purchasing a portion of the Land at the purchase price of $225,000 per acre." Compl. ¶ 37. According to Silver State, the letter of intent "suggests that the value of the Land had increased by approximately 10 times since Silver State submitted its bid in June 2012."[85] Compl. ¶ 38. Additionally, Silver State alleges that "over the course of the 11 months between when BLM accepted Silver State's offer and when BLM wrongfully failed to convey title to the Land, Silver State had been expending significant costs to develop the Land in reasonable reliance of Defendant's performance under the Land Sale Contract." Compl. ¶ 39.

The government primarily characterizes Silver State's damages theory as a demand for "lost profits that [Silver State] allegedly could have earned from selling some of the Property to a third party" and argues that such damages "are *per se* unrecoverable from the United States" because they are too "speculative and remote." Def. Mot. at 57. Put differently, the government believes that Silver State's damages theory hinges on Silver State's plan to sell the Property to D.R. Horton, Inc. for residential or other development. *Id.* at 58. The Court disagrees with the government's characterization of Silver State's damages theory. Taking Silver State's complaint at face value, Silver State does not seek lost profits, *per se*, nor does Silver State's damages theory necessarily depend upon it selling the Property to D.R. Horton, Inc. Instead, Silver State alleges damages measured by the difference between the fair market value of the Property at the time of contract formation and at the time of breach. Compl. ¶ 46. The Federal Circuit in at least one case implicitly has approved this measure of damages for breach of a land sale contract. *See Seravalli v. United States*, 845 F.2d 1571,

---

[85] $225,000 per acre multiplied by 480 acres (the size of the Property) equals $108,000,000. Subtracting Silver State's bid price of approximately $10,000,000 results in Silver State's claimed damages of $98,000,000.

1573 (Fed. Cir. 1988).[86]  Viewed from that perspective, the D.R. Horton, Inc. letter of intent may simply provide evidence of the fair market value of the Property at the time of breach.

Moreover, the Court rejects the government's invitation to dismiss the complaint without the benefit of discovery.  Whether a claimed amount is "too remote and speculative" is ordinarily a question of fact.  *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) ("Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute.").  Indeed, the government only cites a single case, *Smokey Bear, Inc. v. United States*, 31 Fed. Cl. 805 (1994), where the Court of Federal Claims even reached the question on a motion to dismiss.  In *Smokey Bear*, the Court of Federal Claims characterized the "issue for this court [a]s whether the damages plaintiff seeks are the 'natural and probable consequences' of the alleged breach of the license agreement, i.e., whether the damages were within the contemplation of the parties at the time the contract was made."  31 Fed. Cl. at 809.  The Court of Federal Claims held that "[t]he court cannot, without a factual inquiry, say that these damages are not a direct and foreseeable consequence of the government's alleged breach of the Smokey Bear license agreement."  *Id.*  The Court reaches the same conclusion in this case; a factual inquiry is necessary.

Relatedly, the government seeks dismissal of "any claim for reliance damages incurred before November 28, 2012" because those claims rest on an implied-in-law contract over which this Court lacks jurisdiction.  Def. Mot. at 57.  Silver State's complaint alleges that Silver State expended significant sums in reliance on the BLM's

---

[86] In *Seravalli*, "the appellees, as high bidders, entered into a contract to purchase . . . an apartment complex" from the Department of Housing and Urban Development ("HUD"). 845 F.2d at 1573.  "HUD refused to close, however, and unilaterally terminated the contract," leading the plaintiff-appellees to file suit in the Court of Federal Claims "seeking damages reflecting, inter alia, the difference between the contract price and the fair market value of the property on the date of closing."  *Id.*  The case went to trial solely on the issue of damages, with both sides having agreed that the proper measure of damages was the difference between the fair market value of the property at the time of contract formation and the fair market value of the property at the time of breach.  *Id.*  The only issue at trial and on appeal was how to calculate the fair market value of the property at the time of breach.  *Id.*  The Federal Circuit's decision will be instructive as this case moves forward, although the Court generally shares the government's skepticism of Silver State's claimed damages given certain zoning restrictions that appear to have been in existence at least at the time of the transaction.  "[O]f course, a well-pleaded complaint may proceed even if . . . actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (citations and internal quotation marks omitted).

performance "over the course of the 11 months between when BLM accepted Silver State's offer and when BLM wrongfully failed to convey title."  Compl. ¶ 39.  Silver State appears to allege that it incurred certain reliance damages prior to November 28, 2012, or the latest date on which the parties formed the contract.  While such damages would likely be unrecoverable, Silver State also appears to allege that it incurred certain reliance damages after November 28, 2012 but before May 13, 2013, when the BLM allegedly breached the contract.  Silver State must prove its damages via summary judgment or at trial, and the Court, of course, will not entertain damages theories arising from claims over which this Court has no jurisdiction.  At this stage, however, Silver State adequately has alleged that it incurred certain reliance damages, including certain damages after November 28, 2012, and the Court sees no reason to dismiss the Complaint based on one potentially inartful sentence.

Finally, during oral argument, the government argued for the first time that the election of remedies doctrine forecloses Silver State's claim for damages.  Tr. at 111:12-13 ("And there's another problem potentially looming here, which is, you know, election of remedies.").  According to the government, Silver State cannot claim (additional) damages because the BLM already provided restitution when the BLM refused to convey the Property to Silver State and instead returned Silver State's purchase money.  The government misapplies the election doctrine.  As the Federal Circuit has explained:

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action [for restitution], or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach.

*Old Stone Corp. v. United States*, 450 F.3d 1360, 1371–72 (Fed. Cir. 2006) (quoting 13 Williston § 39:32 (4th ed. 2000)).  Here, Silver State did not "elect" restitution; rather, BLM unilaterally elected to return Silver State's purchase price.  Nor did Silver State have a choice "to keep the contract in force [and] declare the default only a partial breach."  *Id.*  The alleged breach was BLM's failure to perform the only action that remained for either party under the contract.[87]  Although the issue may be more fully briefed at a later date, the Court, at this point,  concludes that the government failed to

---

[87] It strikes the Court as strange that the Agency provided Silver State with what the government has characterized as a form of damages (*i.e.*, restitution) while maintaining that the Agency did not breach the contract.

raise this argument in its motion and cannot, for the first time at oral argument, raise a new ground for dismissal. *See L–3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 611 (2008) (citing *Arakaki v. United States*, 62 Fed. Cl. 244, 246 n. 9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete.")).

None of this analysis with respect to damages should be viewed by the parties as suggesting that the Court has some special confidence in Silver State's ability to prove its damages. Indeed, the result here may well amount to nothing more than a Pyrrhic victory for Silver State, but that is a question for another day.

## VI.    This Court Rejects the Government's Remaining Arguments

Alternatively, the government urges the Court to dismiss Silver State's Complaint based on two affirmative defenses: (1) LVNSC's termination of the MPA rendered BLM's duty to convey the Property to Silver State objectively impossible; and (2) the FLPMA would have precluded BLM's performance. The Court holds that it would be improper to rule on the government's affirmative defenses at this stage in the litigation because resolution of both affirmative defenses presents certain questions of fact. Accordingly, the Court denies the government's motion to dismiss Silver State's Complaint based on the government's affirmative defenses.

First, the government argues that LVNSC's termination of the MPA rendered BLM's duty to convey the Property to Silver State objectively impossible. Def. Mot. at 51. The Supreme Court has described the doctrine of impossibility of performance, providing:

> where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*United States v. Winstar Corp.*, 518 U.S. 839, 904 (1996) (quoting Restatement (Second) of Contracts § 261). According to the government, "it was a basic assumption of the parties' agreement that the MPA would not be terminated (let alone *prior* to delivery of the patent)," "it was not the Government's fault that [LVNSC] terminated the MPA," "BLM did not assume the risk that [LVNSC] would terminate the MPA," and, accordingly, LVNSC's "termination of the MPA made it impracticable for the BLM to

consummate the modified competitive sale to Silver State (through delivery of the patent)." Def. Mot. at 52-53.

"Whether performance is factually impossible or commercially impracticable is a question of fact, not of law.  However, the ultimate issue is one of law." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1292 (Fed. Cir. 2002).  The government has not provided a single example from this Circuit where a court dismissed a complaint based on the affirmative defense of impossibility of performance.  Indeed, the government readily acknowledges that "[r]esolution of the defense of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of . . . fault."  Def. Mot. at 51 n.14 (quoting *Lowenschuss v. Kane*, 520 F.2d 255, 265–66 (2d Cir. 1975)).  Nevertheless, and without explanation, the government proceeds to contend that this is "one of those 'clear[] cases' where the defense may be sustained on a motion to dismiss."  *Id.* (quoting *Lowenschuss*, 520 F.2d at 265–66).  The government's out-of-context excerpt from a 1975 decision of the United States Court of Appeals for the Second Circuit provides no support for the government's position here.  In *Lowenschuss*, the Second Circuit explained that "[i]n all but the clearest cases [resolution of the defense of impossibility] will involve issues of fact that must be resolved by the district court only after the parties have had adequate opportunity to investigate and present their evidence."  520 F.2d at 265–66.  The Second Circuit went on to hold that "[t]o resolve the issues of impossibility and illegality, plaintiff is entitled to his day in court."  *Id.* at 266.  Notwithstanding the suggestion that there may be some cases in which a motion to dismiss may constitute a proper vehicle by which to raise impossibility, the Second Circuit itself did not do so it in its decision.

Without any binding or persuasive precedent to support the government's position here, the Court refuses to dismiss Silver State's Complaint based on the government's affirmative defense of impossibility of performance.  Certain elements of the defense would benefit from discovery, and this decision does not preclude the government from raising this defense at a later stage of the litigation.[88]  To the extent that this decision *does* address, however, many subsidiary issues presented in the

---

[88] The Court notes, however, that even where *Congress* itself duly enacts a law that prohibits an Agency's contractual performance, such an enactment may give rise to a breach claim.  *See Winstar Corp.*, 518 U.S. at 895 ("An even more serious objection is that allowing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that, '[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'").  In this case, the Agency's own discretionary assessment and decision cannot serve as the predicate for its impossibility defense.

government's motion related to impossibility, the Court does not anticipate permitting the government to revisit them.

The government also contends that BLM's performance would have been illegal under the FLPMA and urges the Court to "deem Silver State's agreement with the BLM invalid and unenforceable." Def. Mot. at 55. According to the government, the FLPMA, while "not specifically provid[ing] for the invalidation of contracts that defy the statute's requirements," embodies an important public policy and enforcing the contract would be opposed to that public policy. Def. Mot. at 54-55. The Federal Circuit has explained that "[d]etermining whether illegality taints a contract involves questions of fact." *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993). In *Godley*, the Federal Circuit held that the "trial court erred in determining on summary judgment" that a contract "was voidable, rather than void *ab initio*" due to the alleged taint of illegality and remanded the case back to the Court of Federal Claims to determine several "other factual questions." 5 F.3d at 1476; *see Transfair Int'l, Inc. v. United States*, 54 Fed. Cl. 78, 86 (2002) ("[T]he Federal Circuit, interpreting *Mississippi Valley*, [364 U.S. 520 (1961),] held that in considering whether a contract was tainted by fraud or wrong-doing and, therefore, unenforceable, this court was required to resolve questions of fact regarding the contractor's conduct and whether any illegality actually tainted the contract.").

The legal standards that apply to resolve the government's defense of illegality "require this court to weigh various facts that have not yet been established." *Transfair Int'l, Inc.*, 54 Fed. Cl. at 78. Accordingly, the Court denies the government's motion to dismiss Silver State's Complaint based on the asserted affirmative defense of illegality. Although this decision does not preclude the government from taking discovery or otherwise again raising this defense, in general, at a later stage of the litigation, the Court has no intention of revisiting the legal issues decided herein.

## VII.   Silver State Fails to Allege a Valid, Implied-in-Fact Contract

Count II of Silver State's Complaint alleges, in the alternative, that BLM and Silver State entered into "an enforceable implied-in-fact contract for the sale of land, which obligated BLM to convey the [Property]" and that BLM breached that contract. Compl. ¶¶ 48-49. As discussed above, the Court holds that the parties had a valid express contract, which obligated BLM to convey the Property to Silver Stated. "It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002).

Accordingly, Count II of Silver State's complaint is **DISMISSED** because an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Trauma Serv. Grp.*, 104 F.3d at 1326.

### CONCLUSION

For all of the above reasons, the government's motion to dismiss is **GRANTED IN-PART, and DENIED IN-PART**.  The Court **GRANTS** the government's motion to dismiss Count II of the Complaint (breach of an implied-in-fact contact).  In all other respects, the government's motion to dismiss is **DENIED.**

On or before May 22, 2020, the parties shall submit a joint status report, proposing a schedule for discovery and further proceedings in this case.

It is so **ORDERED.**

s/Matthew H. Solomson
Matthew H. Solomson
Judge